HELEN SANDINE, Appellant, v. JOEL E. JOHNSON et al., Appellees.

**PARENT AND CHILD:** Right of Worthy Parent Not Absolute. A
1 parent of good character does not necessarily possess an *absolute* right to the custody of his or her minor child. The best interest of the child is paramount on the issue of custody.

**ADOPTION:** Guardian May Consent. The duly appointed guardian
2 of a minor child, whose father is dead and whose mother is insane, has authority, under Sections 3193 and 3251, Code, 1897, to consent to the adoption of such child.

*Appeal from Buena Vista District Court.*—JAMES DELAND, Judge.

MARCH 10, 1920.

HABEAS corpus proceeding, which involves the right to the custody of a child. After a hearing upon the merits, the trial court discharged the writ and dismissed the petition. The plaintiff appeals.—*Affirmed.*

*Oliver, Harding, Oliver & Royal,* for appellant.

*Healy & Faville,* for appellees.

EVANS, J.—Helen Sandine is the child whose custody is in question. The suit is brought in her name by her mother, Fannie, now known in the record as Mrs. Henderson. For convenience, we shall refer to the

**1. PARENT AND CHILD: right of worthy parent not absolute.**

mother as the plaintiff. The defendants have had the custody of the child since her babyhood, having acquired the same under appealing and compelling circumstances. The defendants claim, also, to have adopted the child. The articles of adoption are assailed by plaintiff as invalid. The contest is a pathetic one, and we are constrained to speak tenderly in dealing with the rights of the respective contestants.

Helen was born on December 30, 1910. The family into which she was born consisted of the father, Gust Sandine, the mother, Fannie, plaintiff herein, and two older children, about 8 and 10 years of age. It was a respectable family, in very moderate circumstances, and dependent upon the current earnings of the father. When Helen was five weeks old, the mother became insane, and was committed to the asylum. The father, with the help of friends, including these defendants, cared for the babe, as best he could. In November of the same year, 1911, the mother was paroled from the asylum, and returned home. One

month later, the father died. Two days thereafter, the mother became again violently insane, and was returned to the asylum, where she remained for several years. She was first paroled therefrom in the fall of 1915, and finally discharged in the fall of 1916.

Upon the death of the father, and this disability of the mother, a loyal uncle, Knute Sandine, the brother of the deceased father, undertook the protection of the little brood in their own home. He was himself unmarried. He employed a domestic to do the work of the household, and received more or less help from sympathetic friends. But domestic help proved to be temporary, and it left him with the babe in his arms. He was helpless to give it the care which it required. He consulted with friends as to the advisability of giving up the child, in its own interest, to some Orphans' Home or Home Finding Society. In the meantime, kind neighbors across the way took the child into their home, and for one year and a half reared her and loved her. These neighbors are the defendants herein. Knute was regularly appointed as guardian of her person, under the provisions of Code Section 3193.

In January, 1914, these defendants purported to adopt Helen as their own child. To that end, articles of adoption were duly signed by them and by Knute Sandine, her guardian, and by the mayor of the town.

2. ADOPTION: guardian may consent. This act of adoption was characterized by the fullest good faith on the part of the defendants and on the part of the guardian.

The superintendent of the asylum at Cherokee was consulted as to the probability of the recovery of the mother. It was the opinion of the superintendent at that time, as expressed to these parties, that she would never recover. Upon her parole, in the fall of 1915, she made her home with her brother, a few miles distant from the home of the Johnsons. She was welcome at the Johnson home at all times,

and visited there a number of times in the course of a year. These friendly personal relations always continued. About one year after her full discharge from the asylum, the plaintiff went to Sioux City, and engaged there in service as hired help, domestic or otherwise. In December, 1918, she was married to her present husband. Some months thereafter, she asked for the restoration of her child. This suit was begun in May, 1919.

The contention made in her behalf may be stated broadly as follows:

(1) That the articles of adoption executed by the defendants are invalid and void.

(2) That, as the surviving parent, the plaintiff has the absolute right to the custody of her child; and that such right is paramount to any consideration of the best interest of the child, in that the mother has not forfeited such right by any wrong-doing on her part.

For the defendants, it is contended that the articles of adoption are valid; that, even if they are not, the circumstances disclosed by the evidence are such as to make the best interest of the child a consideration paramount to the natural rights of the mother.

I. Are the articles of adoption valid? They were legal in form. They were duly executed by the defendants as adopting parents. They were likewise duly executed by the guardian and by the mayor of the town of Marathon. Whether the action of the mayor of the town of Marathon was effective for any purpose, we will not inquire, but will assume the challenge of the appellant in that regard as well taken. *Anderson v. Blakesly*, 155 Iowa 430; *Webb v. McIntosh*, 178 Iowa 156.

Was the consenting signature of the guardian effective? The statute of adoption, Code Section 3251, does not, in terms, include a guardian as a consenting party. It does require the consent of the parents; "or if either is dead, then

the consent of the survivor." This was a case where one parent was dead, and is covered by the portion of the statute here quoted. This statute is comprehensive in its scope, and evidently aims to provide for all contingencies. In other words, it aims to provide a method of adoption for any and every child, under whatever circumstances. If we may not broaden the terms of the statute so as to include the guardian of the person of a child, then there is no way provided therein whereby this child could have been adopted. The mother, as surviving parent, could not have consented, for want of capacity. A consent by the mayor of the city or by the clerk of a district court could not be effective, because "both parents" were not dead, nor was the child "abandoned." Turning to the Code chapter on guardianship, Sections 3192 and 3193 are as follows:

"Section 3192. Parents are the natural guardians of the persons of their minor children, and equally entitled to their care and custody.

"Sec. 3193. The surviving parent becomes such guardian, but, if there is none, the district court shall appoint one, who shall have the same power and control over his ward as the parents would have, if living."

The guardian was appointed under the latter section, as guardian of the person of the child, on the theory that there was no surviving parent competent to act as such guardian of the person. Here, again, we must broaden the terms of the statute, in order to give it a rational construction. To construe this statute literally would be to say that the surviving parent, though *non compos mentis*, was entitled, as a matter of right, to the custody of the person of the minor. We think, therefore, that the guardian was properly appointed, under this section, as guardian of the person of the child. Being the guardian of the person of the child, he stood, for the time being, *in loco parentis*, and, by the literal terms of the statute, had the "same power and control

over his ward as the parents would have, if living" and *compos.* Reading this section and Section 3251 together, the only rational construction of the latter section is that, for the purpose of its application, the guardian of the person of a minor is the legal equivalent of the parent. Such a construction accords with the spirit and manifest purpose of both sections. Such a construction involves no menace to the right and interest of either parent or child. The guardian is an appointee of the court, and an arm thereof. He is directly amenable to the court. It is perhaps true that such an act might be reviewed by the court, and even set aside, if found improvident or unwarranted. No question of that kind is involved herein.

We reach the conclusion that the guardian of the person was authorized by the statute to exercise the power of the parent, and that his execution of the adoption papers was as effective as though it had been done by a *compos mentis* surviving parent.

II. Our foregoing conclusion becomes, of itself, quite decisive of the case. Our examination of the record satisfies us, however, that, if our conclusion upon such question had been otherwise, we should still have to affirm the finding of the district court. Beyond all question, the best interest of the child, in its largest and best sense, requires that her custody remain where it is. This is not saying that the mother has committed any wrong, whereby she has forfeited any rights. But the circumstances which overwhelmed her rendered it impossible for her to perform the duties of a mother to her child. To all appearances, her disability was permanent. Could her sane self wish, under such circumstances, that no one should hear the cry of her babe? Its need was immediate and imperative. Something must be done by somebody, or the babe must needs perish. Temporary expedients, in such a case, are not usually practicable. The tender little twig must be permanently grafted upon

another stem. This is the natural method of human affection, and the law recognizes it and protects it. Concededly, the home that opened its door wide to this least of human beings is an ideal one.

Whether, under her present circumstances, the mother could be deemed suitable to protect the best interests of the child would be a painful question to discuss. She is now married, and it is to be hoped that her marriage may prove a happy one. But the fact of such marriage would make it incumbent upon the court to inquire into the suitability of her husband to have custody of the child, as its stepfather. Much stress is laid by counsel for defendants upon his unfitness for such responsibility. It is to be conceded that rigid cross-examination of him as a witness failed to disclose his history or his occupation. The trial court might well, therefore, have regarded him as an additional impediment in the way of plaintiff's resumption of her parental relations with her child. Sufficient to say that a careful reading of the record leaves no doubt in our minds that the case was properly decided in the district court. Discussion by us of the details of the evidence is not important enough to warrant the infliction of added pain to a maternal heart that commands our pity. The order of the district court must be—*Affirmed.*

WEAVER, C. J., and PRESTON, J., concur.
SALINGER, J., concurs in Division I of this opinion.