NORMAN E. JENSEN, Appellee, v. LAWRENCE SORENSON et al., Appellants.

No. 40385.

■ 

■ 

■ 

■ 

DECEMBER 9, 1930.

*Mears, Jensen & Gwynne,* for appellants.

*Velte & Molzow, Pickett & Swisher* and *L. J. Cohrt,* for appellee.

EVANS, J.—In our discussion herein we shall refer to the

father of the child as the plaintiff, though his name does not so appear in the title of the case. The mother of the child was Pauline Jensen, who died on August 5, 1927. On February 24th of the same year, she had obtained a decree of divorce from the plaintiff, on the ground of cruel and inhuman treatment. These parents were married in November, 1925. Prior to the marriage, the wife was a resident of Black Hawk County, Iowa. The husband was a young bachelor of 35, and resided at Neenah, Wisconsin. After the marriage, Neenah became the family residence. Mrs. Margaret Sorenson, defendant, was the sister of Pauline, and was a resident of Black Hawk County, Iowa. Though the plaintiff prays for the custody of the child, he concedes that he has no home of his own where he can maintain personal care and custody of him. He has an uncle, a namesake, C. W. Jensen, who resides on a farm in the vicinity of Neenah. The plaintiff has arranged with this uncle and his wife for the care and keeping of the child in their family. They appear as witnesses, and testify to that effect. The married life of the parents was very brief. The plaintiff testifies that they lived happily for two weeks after their marriage. Though the wife obtained the decree of divorce, and was awarded the custody of the child, and though the decree found the defendant as the guilty party, he has, as a witness in this case, assumed the role of innocence, and has cast upon his dead wife all the odium of blame. The home of this couple consisted substantially of one room, partitioned off from one end of a garage. In this room the plaintiff had "bached" before his marriage. It was neither luxurious nor spacious, but the pair lived in it happily for two weeks, and could have lived likewise much longer, except for the fault of somebody. About February 1, 1926, being the first winter of their marriage, and of their discontent, the plaintiff began to absent himself from the home. He was a mail carrier, and kept horses and a car upon the premises. Though he kept his horses there, he kept himself aloof from the "home" and from his wife. He continued this course of action for a period of three months. His explanation of this conduct is that he had agreed with his wife upon a divorce; that his attorney advised him, however, that he had no grounds for a divorce unless he voluntarily made such ground thereafter; and that he absented himself from his wife during the three-months period in order

to furnish her grounds for a divorce. The only materiality of this evidence is the light which it sheds upon the later attitude of the plaintiff. One year later, the wife obtained the decree of divorce, wherein the defendant was found to be the guilty party, and such he must be deemed, for the purpose of this case. His purported explanation of his conduct, intended by him in mitigation of the finding of the decree, is, on the contrary, an aggravation thereof. The decree awarded to the wife the custody of the child, reserving to the husband the right of visitation. After the birth of the child, this plaintiff gave no exhibition of affection for it, but, on the contrary, he absented himself from home persistently, and rendered no aid to his wife in the care of the babe. After the divorce, he never availed himself of the privilege accorded him by the decree to see the child. His opportunities were abundant, but he wholly refrained. He explains this conduct by saying that he did not wish to converse with the mother. However, during the mother's final illness for three weeks at the hospital, the child was in the care of others, and for a considerable time in the care of Mrs. C. W. Jensen, the wife of plaintiff's uncle. She is the Mrs. Jensen to whom the plaintiff now proposes to intrust the care of the child. The plaintiff had abundant opportunity to visit the babe while in her care. The same opportunity was open to him while the child was in the care of Mrs. Bulow, who had the care of the child at the time that the mother died. But still the plaintiff refrained. His conduct, as revealed in this record, including his own testimony, indicates a consistent repugnance to the child, and the determination on his part to keep himself aloof from it. This was his attitude when death rendered the child motherless, and in practical effect left it without parental asylum. There was evidence that the mother had expressed her dying wish that her sister, Margaret, should take the child, which was then in the care of Mrs. Bulow. The death of the mother occurred on the evening of August 5th. Her three sisters and her brother had been at her bedside for the last three days of her life. Plans for burial at Cedar Falls were made. At 6 o'clock the following morning, the family cortege, baby and all, left Neenah with the remains, on their way to the burial place. Such were the immediate circumstances attending the migration of the babe in controversy from Neenah, Wisconsin, into Black Hawk County,

Iowa. We set forth herein a few excerpts from the testimony of the plaintiff, bearing upon the matters herein stated:

"Our difficulties arose out of things she said about me, and the way she acted. She told neighbors I did not know anything, and she wished she never had met me. We realized we were not mated for each other. We talked things over, and both of us agreed we should have a divorce. There being no grounds for divorce, they [the attorneys] told us we had to make some grounds—suggested one of us leave, to make grounds for desertion. She would not leave, because she would have no hold on the property. She said she would see that I wouldn't have anything when she got done. I left about the first part of February, 1927, and stayed away about three months. The time I first left, I didn't know anything about the child. * * * She found fault with me to the neighbors. She was always complaining. Between the time Mrs. Jensen left our home and the divorce, she stayed with my aunt and uncle, Chris Jensen. After the divorce, she and the baby went to Iowa for a couple of months. I saw the baby at a distance while it was at Brown's, but didn't go there, because I didn't want to talk to her, on account of the way she had made things for me. I made inquiries about the baby all the time, and have seen how he was taken care of through others. * * *

"We got along for only about two weeks. She told some of the neighbors she wished she had never met me, and told me she didn't care for me. Up until these difficulties, I stayed at home with her nights. Conditions kept getting worse. We both consulted lawyers. My lawyer, Mr. Fitzgibbons, suggested that one of us leave to make ground for divorce on the ground of desertion. I left about the first of February. In about a month, she refused to go on with the divorce. I stayed away a while, and went back, when I had been gone about three months. We agreed to live together until the child was born, and then part, and get a divorce. I didn't know about the child when I first left. I don't remember how much I gave her while I was away. It was $10 or $15 anyway, and maybe $25 out of each check. I was paid twice in a month. My salary is $2,300 a year. It costs about $1,000 a year to keep up my conveyances. * * * After I came back, we did not get along. She was always complaining,

and finding fault with me. * * * I learned in March or April of 1928 that they had adopted the boy. * * * In the divorce action I made no objection to my wife being given the custody of Norman. The decree provided that I could see him once a month. My wife worked for Mr. Brown for about three months, but I didn't stop to see the baby because I didn't want to talk to my wife. I didn't know until the day after my wife's death that Sorensons had taken the baby back to Iowa. I figured they would do the right thing by him. I guess I wrote Sorensons a letter, three or four months afterward, stating I was glad they had him. I felt the boy was being well taken care of. I have never sent them any money to take care of the boy. * * * I was allowed to see the boy once a month by the divorce proceedings. I never stopped to see the boy during the three months my wife was at Brown's. I didn't want to talk to Pauline. She had made it so miserable for me. I have never attempted to visit the baby in Iowa. I thought Sorensons would take just as good care of the boy as his own mother would, and I guess they have taken good care of him, so far as I know. I don't think anybody else would take any better care of him, but just as good. * * * I first went to see Mr. Velte, the lawyer, about the divorce. He told me my wife had been there first, and that he would see that she got all I had. I figured I had better see a different lawyer. My lawyer, Mr. Fitzgibbons, advised me to stay away a while, so she could get her divorce on the ground of desertion. I stayed away a month, but she had changed her mind, and wouldn't have a divorce. I gave her a little more time, thinking she would change her mind again; but she wouldn't have no divorce, so I went back and stayed. We found out she was going to have a baby. I hadn't known that, during the time I was away. I thought it was just things they were bringing in, just to clean me up. I came back in May. We were divorced the next February. My wife died six months after the divorce. I didn't visit the baby during the six months. I seen the baby at Brown's a couple of times, but didn't stop, because she was always there. * * *

"When our trouble first came up, we both went to the same lawyer. He told us neither had grounds for divorce,—neither one of us could leave, to make grounds; and we decided between ourselves that we wanted a divorce, and that was why I left.

We had the understanding at all times that a divorce would be secured.''

Mrs. Sorenson took the baby into her home and into her heart, where it has nestled ever since. No one impugns her good faith up to this point. For the last three months preceding her final illness, Pauline Jensen had been employed in the home of Mr. Brown, a banker at Neenah. After her death, Mr. Brown was requested to act as administrator of her estate. With a view of such administration, Mr. Brown, within a few days after the funeral, wrote to Mrs. Sorenson that it would be necessary for the guardian of the child to petition for his appointment as administrator, and he advised her to obtain letters of guardianship for that purpose. A formal petition was prepared, and sent to her by the attorney for the estate (now the attorney for the plaintiff), for her signature as such guardian. She accordingly applied for guardianship in the district court of Black Hawk County, and obtained letters therefor. Pursuant thereto, she signed the petition, and the same was presented to, and acted upon by, the probate court at Neenah, Wisconsin. A few weeks later, the plaintiff wrote her a letter, expressing satisfaction at what she had done. Such was the attitude of mutual acquiescence of all parties concerned, when, in February, 1928, Mrs. Sorenson and her husband, Lawrence, formally adopted the child as their own, pursuant to the provisions of Sections 10501-b1 to 10501-b8, inclusive, of the Code, 1927. The plaintiff learned of this adoption in March of the same year. He had a sister who lived in the vicinity of the Sorensons, and he testified that he relied on her to give him information. Three months later, the plaintiff, by a letter written by his attorney, requested the custody of the child. On April 9, 1929, this suit was brought. This demand for the custody of the child was not pursuant to a continuing purpose on the part of the plaintiff, but was the result of a change of mind, as indicated by his own testimony. He testified: ''Things have come up that I would rather have the boy in Wisconsin.'' And again:

''There was no way I could take care of him, so I figured I would let things go for a while, and see how things turned out. I figured that they would do the right thing with him all right. I might have written a letter to Sorensons after they had

the baby three or four months, telling them I was glad they had him. At that time I thought they were going to do the right thing. I didn't ever suspect they were going to adopt him.''

Upon the foregoing facts, it is the contention of the plaintiff that, notwithstanding the decree of divorce, which awarded custody to the mother, yet, upon her death, he, as the surviving parent, became entitled to the custody of the child. It is also contended that the domicile of the child was never changed by the action of Mrs. Sorenson, and that no jurisdiction was acquired by the district court of Black Hawk County. He filed an amendment to his petition, challenging such jurisdiction, and praying that the letters of guardianship and the decree of adoption be each set aside and held for naught. It is also contended that the plaintiff had no notice of the adoption proceedings, and for that reason was not bound thereby. These contentions were sustained substantially in the trial court.

I. One of the errors assigned relates to the exclusion of evidence. Mrs. Sorenson had testified without objection to the dying request of Pauline that she take the child. She had taken the depositions of Rev. Larsen and Margaret Rasmussen to the same effect. When the deposition of Larsen was being read in evidence, the answer to the question whereby this testimony was sought was objected to, as incompetent, immaterial, irrelevant, and hearsay, and that the witness was incompetent to testify to a personal transaction. This objection was sustained. Substantially the same objection and ruling were made in connection with the deposition of Margaret Rasmussen. It is suggested by appellee that this error cannot be considered because there is no statement in the abstract as to what the appellant expected to prove by the question propounded. The rule invoked by the appellee at this point has no application to a deposition. The deposition necessarily shows just what would be proved by the answer. Such deposition is necessarily before the trial court in making its ruling, and is necessarily before us for the purpose of review. The answers thus stricken tended to show such dying request. The evidence was material and competent. Though such request

is not controlling or binding upon the court, it nevertheless is regarded as of great weight, and entitled to consideration. *Holmes v. Derrig,* 127 Iowa 625, and *In re Guardianship of O'Connell,* 102 Iowa 355.

It is also urged by appellee that the evidence was cumulative at best, in that Mrs. Sorenson herself had testified to the fact. One difficulty with this position is that the ruling of the court indicated its view that such evidence was not admissible. It would naturally follow that the court would disregard the like objectionable evidence of Mrs. Sorenson, and would give it no consideration. We think there was error at this point.

II. The larger merits of the case relate to the conduct and attitude of the plaintiff at the time of the death of his wife, and the legal effect thereof upon his parental rights. It has been held in many jurisdictions that the custodial right of a divorced parent to whom custody has been denied by the decree is revived by the death of the other parent, to whom custody was awarded. We have never had occasion to pass upon the question in this state. For the purpose of this appeal, we shall assume such to be the law, without so deciding at present.

Under Section 10501-b4, no notice to parents is required where the child had been abandoned, nor any such notice where the child is not in the custody of either parent, but in the care of a duly appointed guardian. Added to this is our own judicial holding that the custodial right of a parent is subject to his fitness for such custody, and is subject to the rights of other suitable custodians to whom the parent has waived his custodial right. The conduct and attitude of the plaintiff bear upon the question of waiver, forfeiture, and abandonment. If one or all of these be made to appear, not only must the plaintiff fail in his suit, but the decree of adoption must be recognized as valid.

If it be assumed that the death of the mother revives the custodial rights of the father, notwithstanding the decree, yet such right is presumptive only. The right to custody, if asserted by such parent, imposes upon him the obligations attending such custody. It is perhaps correct to say that, if the parent has a

right to such custody, he has a duty to assert it, and to assume all its obligations. In the case of a mere babe, such duty is not only an imperative one, but is an immediate one. Even as Mrs. Sorenson had to act quickly, in obedience to the dying request and to the dictates of humanity, so it was incumbent upon the plaintiff to act as quickly, if he proposed to assume the custody of his child. A babe without custodial care may perish in a few hours. The plaintiff knew of the illness of the mother. He knew the peril of loss confronting the babe. He claims that he did not know of the death of the mother until the next day, but he could have known it. He was close at hand. He was bound to know it, if he proposed to assume custodial duties to his child. In the light of his specific conduct toward the child in refraining from any contact with it up to the hour of the mother's death, and in the light of his subsequent acquiescence and indifference to the welfare of the child for many weeks, we deem it a fair inference that he had no intention to assert his right of custody or assume the obligations attached thereto. If these sisters had turned away from the burden of its custody, and had gone home with the remains of the mother, the babe would have been virtually abandoned, subject only to the tender ministrations and mercy of a stranger thereto. In this situation, Mrs. Sorenson took the child, not temporarily, nor under any temporary arrangement with the plaintiff, or with anyone else. She took it in good faith, intending to carry out the dying request of her sister and to make the child as one of her own. The plaintiff must have so understood it, because he knew that he had no arrangement with her; and he must be deemed to know that he himself had the first presumptive custodial right. His very acquiescence was evidence that the taking by Mrs. Sorenson interfered with no plan of his. His letter some weeks later evinces the same state of mind. He never gave, nor offered, a dollar of contribution to the child's support. According to his own present showing, there has never been a day since the death of the mother when he could have taken this child into his custody and cared for it. After years of delay, he has made arrangement with his uncle, not to adopt the child as his own, but to rear him for the plaintiff. The plaintiff assumes an obligation to his uncle for such service. Disagreements may come, and the arrangement may fail, later. No one disputes the suitability

of the Jensen family, nor does anyone dispute the suitability of the Sorenson family. The Jensen family is better situated financially, and the home is better located with reference to the school privileges of Neenah, Wisconsin. These factors the court found to be in favor of the Jensen family. In our judgment, it should be found, upon this record, that, at the time of the mother's death, the plaintiff had no intent to assume custodial rights of the child, and that, in practical effect, the child was abandoned, so far as he was concerned. For the same reason, he should be deemed to have forfeited and waived his custodial rights and should be permitted now to challenge the custody of the Sorensons only on the ground of unfitness.

III. As to the question of the best interest of the child, there is no occasion for extensive discussion. As already indicated, the record does not challenge the substantial fitness of the Sorensons for the purpose of their undertaking. The fact, if such, that the Jensen home would be a still better place from a financial and educational point of view, is not controlling. The Jensens are not parties to the litigation. They have no rights to protect. The contest is between the plaintiff, himself, and the present custodians. In plaintiff's favor it is proper to consider the nature of the arrangements which he has made for the purpose of the custody of the child. Notwithstanding that the plaintiff has forfeited, by his conduct, his primary right to demand the custody, he is not thereby precluded from contending for the best welfare of the child. It is important, as we have often said, that the custody of a child should be determined promptly, and that it should be permanent. The child must be given a place to *grow*. It should not be too readily transplanted. Nor should it be tossed like a ball from base to base. For three years this child has been growing in the Sorenson family, and has found affection there. In our judgment, no adequate reason is shown in the record for a change of custody, unless it should be held that the father has a primary right to such custody. In cases where others than the parent have maintained the care and custody of a child and have become bound to it in affection, we have not infrequently held the rights of such custodian to be paramount to the rights of a parent, in a given case. Much that we have said in previous cases is quite

applicable to the case at bar. In *Knochemus v. King*, 193 Iowa 1282, we said:

"Parental rights must sometimes yield to the feelings, interests, and rights of other parties, when acquired with the parent's consent. It would be fundamentally wrong, both in law and in morals, to sever the relations of a child from those who have nursed, loved, and cherished it for a long period of years, and such an arrangement, under an agreement, express or implied, should not be revocable at the pleasure of the parent."

In *Barry v. Reeves*, 203 Iowa 1345, we said:

"This mother, without there being any reasonable excuse therefor, has lived in the same city with her son for these years without evincing more than what might be termed a casual interest in him, and without any effort to share his companionship or give to him any of her individual care or affection; while, in the meantime, to her knowledge, the appellant and her husband were rearing this child as their own, giving him care and affection, training and education; and necessarily, day by day the bonds of filial affection between him and the appellant and her husband were being strengthened. We are thoroughly persuaded that the best interests of the child will be promoted by his retention in the home where he has been reared from the day of his birth, and that the claims of the appellee to the custody of the child, under all of the facts and circumstances as shown by the record, in view of the promotion of the best interests of the child, must be deemed to be inferior to those of the appellant."

In *Sandine v. Johnson*, 188 Iowa 620, we said:

"Beyond all question, the best interest of the child, in its largest and best sense, requires that her custody remain where it is. This is not saying that the mother has committed any wrong, whereby she has forfeited any rights. But the circumstances which overwhelmed her rendered it impossible for her to perform the duties of a mother to her child. To all appearances, her disability was permanent. Could her sane self wish, under such circumstances, that no one should hear the cry of her babe? Its need was immediate and imperative. Something must be

done by somebody, or the babe must needs perish. Temporary expedients, in such a case, are not usually practicable. The tender little twig must be permanently grafted upon another stem. This is the natural method of human affection, and the law recognizes it and protects it."

In *In re Guardianship of Lally*, 85 Iowa 49, we said:

" 'The testimony shows that he [the father] has no home of his own; that he proposes to place the child in the family of a friend. \* \* \* For aught that appears, they might at any time, in a day, a week, or a month, abandon the care of the child,' etc. So in this case there can be no assurance that the Browns will, under the circumstances, keep these children for any length of time, even if the plaintiff's prayer be granted. It will not do to take this child from a good home, and put her in a position of such uncertainty."

Upon this record, the suitability and fitness of the plaintiff to take and care for this child of tender years are not comparable to that of its present custodians. The fact that he may have the present help of the Jensen family is a circumstance to be considered in his favor, as far as it goes. But such an opportunity does not offer the security of permanency and finality, as does the existing custody, where the tendrils of affection have been growing for three years. It is our opinion that the welfare of this child requires that it remain where it is.

IV. Pursuant to our foregoing findings, it must also follow that the proceedings of adoption were valid. While it is true that the domicile of an infant is fixed by the domicile of his parent, yet that rule rests upon the hypothesis of the parental custody of the infant. We have held that, after the death of both parents, the next of kin becomes the natural guardian of an infant, and may determine his domicile. In such case we sustained such a change of domicile from Iowa to Wisconsin. *In re Guardianship of Benton*, 92 Iowa 202. In that case we said:

"Guardians by nature have the right to change the domicile of their wards, if done in good faith. And while the next of kin may not change it so as to affect their rights of succession or of property, yet, if the change is made in good faith, a new domi-

cile may be acquired, which will give a probate court jurisdiction to appoint a guardian at law for them."

The same rule should logically be applied where one parent is dead, and the other has abandoned the child or forfeited his custodial right. In other words, when an infant is lawfully and permanently in the custody of a guardian, its domicile should be permitted to follow that of the guardian.

V. The appellee urges upon us that the case is not triable *de novo,* and is reviewable on errors only. Where the issue turns upon the best welfare of the child, and involves the overturning of presumptive parental rights in the interest of the child, we have found it difficult to separate questions of law from questions of fact, and have found ourselves unable to adhere very strictly to the rule contended for by appellee. We have necessarily recognized the fact that the determination of such issues carries us into the field of equity, and that it is indispensable that principles of equity be applied. In our recent case of *Barnett v. Blakley,* 202 Iowa 1, we said:

"As now used and recognized, in cases involving the custody of children, the writ of habeas corpus operates to invoke the broad powers of the court of an equitable nature, to determine the question of custody of a minor child according as the welfare and best interests of the child may require, having due regard to the legal rights of parents and others."

Aside from the foregoing, the present suit is something more than a habeas corpus proceeding. After service of the writ, the plaintiff amended his pleading, setting up the decree of adoption and the order appointing a guardian, and prays that such orders of the court be set aside and held for naught. Plaintiff relies on facts not appearing on the face of the judicial orders, as the ground for nullifying the same. He necessarily invokes the equity jurisdiction thereby.

The judgment below is—*Reversed.*

All the justices concur.