HOWARD GENE VANDEN HEUVEL, by his Mother and next friend, SALLY VANDEN HEUVEL, appellee, v. JAREN G. VANDEN HEUVEL et al., appellants.

No. 50938.

(Reported in 121 N.W.2d 216)

APRIL 9, 1963.

Life, Davis & Life, of Oskaloosa, for appellants.

Newton Dilley, of Grand Rapids, Michigan, and Robert J. Spayde and Dwaine Meyer, both of Oskaloosa, for appellee.

LARSON, J.—This habeas corpus action of Howard Gene Vanden Heuvel, by his mother and next friend, Sally Vanden Heuvel, plaintiff, against Jaren G. Vanden Heuvel, the father, and Henry Vanden Heuvel and Gertrude Vanden Heuvel, paternal grandparents of the minor child, defendants, alleges the child is illegally restrained of his liberty by defendants, and Sally's rightful custody of him is prevented.

On April 3, 1962, a writ was issued and served upon the defendants, who appeared and filed pleadings in the matter, including a counterclaim asking that they be granted the full care and custody of Howard, then about two and one-half years of age, and alleging that it would not be for the child's best interest and welfare to give custody to the mother, Sally. The issue for the court's determination here, as in the usual case of this kind, is in whose custody will the best interest and general welfare of the child be served—a very simple question with no completely satisfactory answer.

The trial court, after a lengthy trial, found the equities were with the mother and granted to her the care, custody and control of the plaintiff, Howard Gene Vanden Heuvel. The de-

fendants have appealed contending the trial court erred in finding the mother was a fit and proper person to have custody of the child, that the best interest of the child would be obtained by granting the custody to the mother, and in permitting the removal of the child to the mother's residence in the State of Michigan. We shall consider these contentions in that order.

The record discloses that Sally, now 22 years of age, and Jaren, now 26 years of age, were married at Grand Rapids, Michigan, on January 29, 1960, after an acquaintance of about one year while both were attending Calvin College. They set up housekeeping in an apartment at Kalamazoo, Michigan, where Jaren was then attending Western Michigan University. Some financial and emotional difficulties arose, making the marriage somewhat less than ideal. Howard was born July 30, 1960. The evidence adequately supports a finding that due to illness, a not unusual product of mental and emotional disturbances at such time, Sally did not keep house in an acceptable manner subsequent to the marriage and that, after the child's birth, she failed to give him proper care and attention or exhibit love and affection for him. Up until the seventh month of her pregnancy Sally was employed, and at one time was the sole source of the family income. Conditions did not improve in the next two and one-half months after Howard's birth and Jaren, urged Sally to take the baby to his or her parents for a while. She consented to visit his parents in Iowa and, although obviously quite ill, Jaren sent her and the child alone by train to Ottumwa, Iowa, where they were met by his parents. The mother and child were then taken to the farm home near New Sharon, Iowa. After spending approximately two weeks at the Henry Vanden Heuvel home, Sally left the baby with the grandparents and went to Chicago, where Jaren met her. They then went to Grand Rapids, Michigan. On October 21, 1960, Sally was persuaded to become a voluntary patient at the Pine Rest Christian Hospital, a psychopathic institution maintained largely by the Christian Reformed religious sect. The baby has remained with the paternal grandmother on the Iowa farm, except for two brief visits to Michigan, once to see Sally at the hospital and once to see his father at Kalamazoo. It appears Sally had been assured

she could have her child when she was well and able to adequately care for him.

At the Pine Rest Hospital Sally's mental illness was diagnosed as being "that of a schizophrenic reaction and what is called the schizo-affective type." She remained at the hospital for about eight or nine months and received appropriate care and treatment as a patient of Dr. Stuart Bergsma, M.D., Clinical Director at Pine Rest (a Fellow of the American College of Surgeons and a Diplomate of the American Board of Psychiatry and Neurology), whose specialty is psychiatry.

Sally's alleged disillusionment and disappointment from a lack of sympathy, love and understanding of her husband, was not altered when Jaren instituted a divorce action against her in the Circuit Court of Kalamazoo County, Michigan, on April 25, 1961. This action culminated in a "Final Decree of Divorce" dated December 8, 1961, granted Sally on her "Cross-bill of Complaint". On July 12, 1961, she was discharged from the hospital, but she had been permitted to work outside the institution after June 10, 1961.

The record discloses that Sally is a high-school graduate, has attended Calvin College at Grand Rapids for a year, and is now taking five hours of study there, making a B grade in her courses. Since her discharge from Pine Rest, she has been steadily employed as a practical nurse and now works at the Maple Grove Medical Facility operated by Kent County, Michigan, at Grand Rapids. Her work record is excellent and she earns $46 per week take-home pay. Her superiors speak highly of her work and personality.

Sally has been residing with her childless sister and brother-in-law, Jeanette and Marvin Diepstra, who own a neat, well-kept, modern and comfortable Cape-Cod bungalow in a very nice residential section of Grand Rapids. It has a large fenced back-yard with a sandbox. There are two rooms upstairs available for Sally and Howard, and there are two bedrooms, bath, kitchen, and living room downstairs, and a full basement. There are children in the family next door. Sally pays a modest sum for these facilities and Howard will be more than welcome into that home. Work schedules have been arranged between Sally and

her employed sister so that Howard will be provided with full-time and adequate care and supervision in this home.

The record also discloses that since leaving Pine Rest Sally has become quite active in church youth activities and has demonstrated to authorities and acquaintances, many of whom testified for her, a sincere fondness for children and the patience and ability to manage and get along well with them. Her baby-sitting record reflects credit upon her present capabilities, and there was no evidence to the contrary.

The trial court observed that during the long trial, which by the very nature of it was a most emotional experience for her, "Sally demonstrated a marked degree of sincerity, composure, self-control, poise and stability."

As to charges of sexual irregularities, three or four of which Sally admitted, the court found they were properly attributed to her then immaturity and her later mental illness. After careful consideration of that evidence, it observed that while those incidents were regrettable, there is "no reasonable likelihood that they will reoccur." Only the interested parties gave testimony on this unusual relationship.

It appears an ill-advised attempt to obtain the physical control of Howard by self-help occurred in October 1961. When Sally was refused the return of her son and was denied the right to visit him on weekends, she sought the aid of a private detective, who unfortunately directed the abortive attempt to take the child from a store in Oskaloosa, Iowa. That activity was wholly improper, as Sally now sorrowfully admits. The mistake was made, she says, because of her great desire to regain her son and by accepting and following such poor advice from another.

Doctor Bergsma, Sally's psychiatrist, and Dr. Edwin M. Williamson, M.D. (Chief of Staff of Plainwell Sanitarium, Kalamazoo, Michigan), who, at the request of one of the attorneys representing Jaren in the divorce proceedings, made careful and thorough psychiatric examinations and evaluations of Sally just before this trial and sometime subsequent to her discharge from the Pine Rest Hospital, and each expressed the opinion that Sally had recovered from her mental illness and is,

from a psychiatric standpoint, a fit and proper person to have the care and custody of her minor child, Howard. While it is true these doctors used the term "remission" in describing Sally's condition, it was the trial court's understanding, as it is ours, that they intended to indicate thereby that Sally has, for all practical purposes, recovered from her mental illness and that the possibility of any recurrence is remote. Doctor Bergsma, after his examination of April 20, 1962, said, "the patient is in good remission and has constantly improved since she has been discharged from the hospital. Her attitude and general behavior are very good. Her stream of mental activity is clear and logical and all she states was relevant. * * * she was dressed in a restrained way and very neatly, was calm, in no way disordered and remarkably composed. She spoke open-facedly and open-mindedly, was quite natural, without any undue anxiety nor elation nor suspiciousness, nor was there any depression; but she did show concern about having her child restored to her." As to the probability of a recurrence he testified on cross-examination, "Any illness can be repeated—a schizophrenic condition is a functional condition. There are certain forms which become permanent which she [Sally] did not have." He further testified, "By the word remission we mean that the patient has reached a stage in her recovery which others might call a 'cure'. We mean that she has reached a mental adjustment in which she is adjusting once more on a plane that is what may be considered normal, so that she is in good adjustment with herself, with her fellowmen and religiously; as a religious person, which she is, with her God. This fairly describes her condition as of July 12, 1961." There were no professional opinions to the contrary, so defendants' fear of an improbable recurrence of her mental illness has no factual support. In fact, we note Dr. Robert Alberti, M.D., defendants' witness, on cross-examination testified he had visited with Sally and personally knew of no reason why she was not qualified to have the custody of the child.

Many substantial residence and church authorities of the Grand Rapids area who have had various and close relationships with Sally since her release from Pine Rest testified that in their

opinions Sally is fully capable of properly caring for her son and will be a loving and devoted mother to him. Thus the trial court's finding that Sally is now a matured and well-oriented person possessed of a normal outlook upon life and of a normal motherly instinct, that she has the ability and desire to assume the care, custody and control of her child, Howard, is fully supported by the evidence.

On the other hand, Jaren holds degrees from Calvin College and from Western Michigan University. Since receiving his Master's Degree he has been employed as Clinical Psychologist at the Iowa Annie Wittenmyer Home for children at Davenport, Iowa, where he is well liked and his work has been entirely satisfactory. He bears a good reputation, is devoted to his son, and spends many weekends with him at the Henry Vanden Heuvel home.

Mr. and Mrs. Vanden Heuvel both have excellent reputations and are well regarded as parents, having reared two sons in addition to Jaren. The younger son, now age 14, still is at home, a high-school student. They are devoted to Howard and have provided him with good care. The farm home is modern and is located on their 230-acre farm. At the time of the trial Gertrude Vanden Heuvel was 46 years of age, and Henry, who did not testify, was 48 years of age. Both are in good health and can furnish Howard a satisfactory home.

I. Although some definite rules have been laid down and recognized as applicable to cases of this nature, it is obvious each case must depend largely upon the facts disclosed by the evidence. York v. York, 246 Iowa 132, 136, 67 N.W.2d 28; Maron v. Maron, 238 Iowa 587, 28 N.W.2d 17. Our review here, of course, is de novo. Jensen v. Jensen, 237 Iowa 1323, 25 N.W.2d 316. So once again we are faced with the task of deciding whether under the revealed circumstances the interest and welfare of this child Howard will best be served by his being placed with his mother or with his father and his paternal grandparents. No one can be sure on this point, for as we pointed out in Patzner v. Patzner, 250 Iowa 155, 159, 93 N.W.2d 55, 57, a determination that appears wisest today may by a turn of events be found tomorrow to have been unfortunate.

Courts realize they are human agencies and, as we cannot be positive as to the future, we admit the possibility of a mistake and decide such matters on the conditions as they now appear, with full confidence courts will correct inequities later appearing. Our attempt is, therefore, to arrive at what seemingly is the best solution under the facts and circumstances as they presently appear.

The trial court apparently believed the physical facilities offered by both parties were more than adequate, that the parties were both fit and proper parties to have the child's custody, and felt the small child's best interest would be served by placing him with his mother. We agree.

 II. This action, instituted by the plaintiff, is a statutory proceeding. Where the custody of children is involved, we have adopted the rule that the scope of the writ of habeas corpus is enlarged and invokes the broad equitable powers of the court. The ultimate consideration in such cases is, of course, the best interests and welfare of the children before it. Ball v. Ball, 250 Iowa 763, 765, 96 N.W.2d 317; Stillmunkes v. Stillmunkes, 245 Iowa 1082, 1085, 65 N.W.2d 366, and citations; Helton v. Crawley, 241 Iowa 296, 309, 310, 41 N.W.2d 60, 68, 69. In this connection we have often stated it is well settled in Iowa that the best interests of the children must govern in these cases, and all other considerations, such as parental rights, desires and past-rendered services, must yield readily to this determination. Patzner v. Patzner, supra. Clearly, reward or punishment of the claimants is not a consideration relevant to the issue involved.

 We are, of course, mindful of the presumption that a young child will be best advantaged by being placed in the custody of the mother. We are also aware that this presumption has been weakened somewhat in recent years, so while it may be said such a presumption is not strong and can readily be overcome by other evidence, there must be some such substantial evidence. Thus, as a general rule the court would be right, save in exceptional circumstances, in holding the mother best fitted to care for her child of tender years. Maron v. Maron, supra, 238 Iowa 587, 591, 28 N.W.2d 17, 19; Stillmunkes v. Stillmunkes,

supra; Voy v. Voy, 241 Iowa 673, 676, 41 N.W.2d 869. The rule is applicable here.

III. There is another rule to which we have often referred and which necessarily has much force in the case at bar. It is that, where much depends upon the credibility of the witnesses and the appearance and the demeanor of the litigants, we give weight to the findings of the trial court. Then, too, it has some discretion in matters of child custody, and we have often said we reverse only when it appears this discretion has been abused. Patzner v. Patzner, supra; Rahn v. Cramer, 249 Iowa 116, 120, 85 N.W.2d 924, 926; Stillmunkes v. Stillmunkes and Maron v. Maron, both supra; Wood v. Wood, 220 Iowa 441, 447, 262 N.W. 773, 776; Voy v. Voy, supra. This is a good rule, for while we may read cold print relating to reputation, the trial court, with the parties before it, could more accurately determine the vital question of character in such cases. In the Wood v. Wood case, supra, we considered opinion evidence, finding it only one of several elements entitled to weight in determining the fitness fact, considered the separation of immature minor children from a mother possessing a normal outlook on life, with normal motherly instincts, a tragedy, which we said should be avoided wherever possible, and held, except where the trial court's discretion in such custody case is clearly abused, its determination should be respected and confirmed. On the other side of that coin we have held that where a child or children have been under the good and satisfactory guidance and influence of the father and grandparents for a number of years, the best interest of the children is in the stability of their environment, and that their custody, *once determined,* should remain permanent. Jensen v. Sorenson, 211 Iowa 354, 233 N.W. 717, and cases cited therein. Here, of course, there has been no judicial determination of custodial rights in Howard, unless it be conceded the Michigan court's award of custody of this child to its mother in the divorce proceedings in 1961 did so. We understand no such concession is made by defendants here. Nevertheless, the fact that Howard has been in the paternal grandparents' home over two years was entitled to and received due consideration by the trial court, even though perhaps during

the past year plaintiff's request for his return to her had been ignored by defendants.

The weight given to the testimony of Sally, Jaren and Gertrude Vanden Heuvel depended greatly on their credibility, their appearance and demeanor during the trial, and the trial court saw and heard these interested parties and was in a much better position than we to evaluate that testimony. However, we have carefully gone over the record and have tried to evaluate the testimony ourselves, and our conclusion is that we find nothing which indicates the trial court abused its discretion when it held that Sally was a fit and proper person to have the custody of her child, Howard, and that his best interest and welfare would be best served by placing his custody with the mother, Sally. At least, nothing appears that would require a reversal of that determination now.

IV. Where the record does not bear out a finding that the mother of a small child is presently suffering from a mental disease, but does show she has been discharged from treatment of such disease with symptoms under remission for a reasonable length of time, and shows no probability of a recurrence, the mother should not be deprived of the care and custody of her child for that reason. McKay v. McKay, 253 Iowa 1047, 115 N.W.2d 151, and cases cited therein; Wood v. Wood, supra, 220 Iowa 441, 262 N.W. 773, 775. There is a striking similarity in the McKay case, recently decided by us, and the one under consideration here. In each case, while the wife was suffering from a mental illness the husband sued for a divorce, the child or children were cared for by the in-laws, and when the wife had sufficiently recovered to be discharged from hospitalization and was then employed and self-dependent, and had secured a divorce by cross-petition, her efforts to obtain the care and custody of her child or children were resisted by the husband and the in-laws. Counsel for appellants concede the cases are quite similar, but contend in the McKay case there was no evidence of past sex deviation or moral delinquency such as appears in this record. They further emphasize the fact that Wood v. Wood was based on the premise that the mother had a normal mental outlook. In the McKay case we carefully reviewed the

evidence and held the interest of the children would be best served by placing them in the custody of the mother, even though there the mother was still under some medication and the psychiatrists called differed in her capabilities. However, the experts there, as here, agreed that "in remission" meant where the symptoms of illness were absent. Such words were often used by the profession instead of "cured".

The case at bar is much stronger in support of a finding of complete recovery of the mother. It clearly appears she has had no treatments or medication for over a year after her discharge and shows no signs of a recurrence of her illness. All the experts' testimony was to the effect that she did not have the permanent type of mental illness of that nature, would probably never have a recurrence of her illness, and that they knew of no reason why she should not have the care and custody of her child. Many lay witnesses gave the same opinion.

We agree with the trial court that the evidence fully justified the conclusion that the mother has fully recovered, that she will not be likely to encounter the disturbing conditions or relationships which originally brought on her mental illness and unusual behavior. Therefore, on the fitness of the mother issue we are satisfied the trial court's judgment was correct.

V. As to the fitness of defendants Henry Vanden Heuvel and Gertrude Vanden Heuvel to have the care and custody of Howard, there can be no doubt. Both are in good mental and physical health and have excellent reputations in the community as citizens and as parents. It is true Gertrude had some mental illness when her last son was born and had also taken treatment at the Pine Rest Institution some years ago. She too has completely recovered.

As to the fitness of defendant Jaren, we are not so sure. His testimony as to Sally's shortcomings appears too eagerly given. It is clear he too has made some mistakes in the past. While he bears a good reputation and holds a very responsible position, his conduct toward and treatment of Sally, his wife, at the time of her greatest need does not tally with the standard of conduct we would like to find in a father and devoted husband. Significant was his lack of concern for the welfare of his ill

wife and baby as he sent them both on a hard train trip alone to his parents' home rather than obtain help for her in their apartment or take them to Iowa himself. His premature effort to divorce his wife when she was ill in the hospital discloses little or no love or sympathy for his unfortunate wife. While perhaps these circumstances do not directly concern the issue of the child's present welfare, we said in the McKay case such circumstances might be considered in determining what kind of man the father was, a matter of real concern when the issue of future child custody is being decided. Even if Jaren has recently been a good thoughtful father and has furnished the money for Howard's necessities, as he should, and even if the trial court found him to be a fit person to have his son's custody, he may not be the one best able to provide for the child's best interest. Clearly, he could not care for the boy without the help of his parents, and we have not favored joint custody of children, especially where the parties do not live in the same household.

Therefore, we are inclined to believe it best for this child to place him in the custody of his mother where the responsibility for his well-being and discipline will be in a single person who loves and cherishes him as only a mother can. Under the circumstances it seems better than to have his custody in the father who only spends weekends with him, while his actual care and training are left to his paternal grandparents. Should Jaren remarry and remove the boy to his new home, status quo, the most persuasive contention for denying this writ, would not be maintained.

VI. The question as to whether the mother should be given the custody of this child in view of the fact that she intends to remove him from this state naturally gives us some concern. We have several times approved the statement that it is against the policy of the law to permit the removal of a child from our jurisdiction unless its welfare would be better served thereby. McKay v. Ruffcorn, 247 Iowa 195, 203, 73 N.W.2d 78; Jensen v. Jensen, supra, 237 Iowa 1323, 1330, 25 N.W.2d 316, 320; Blundi v. Blundi, 243 Iowa 1219, 1225, 55 N.W.2d 239, 243; 67 C. J. S., Parent and Child, section 12h, page 667; Pugh

v. Pugh, 133 W. Va. 501, 56 S.E.2d 901, 15 A. L. R.2d 424, 429, 430, and annotation 432. We may point out, however, that this rule is usually applicable to the situation where divided custody is considered, where one party resides outside the state and, by permitting the child to be taken from the state, a situation may arise where much litigation would be necessary to obtain its return. No such situation is here contemplated.

The trial court considered carefully this question and decided it would be for Howard's welfare to permit his permanent return to the state of his birth to be with his mother, and that this transfer would not be in the nature of an experiment. We are inclined to agree, for if it was to be considered an experiment it clearly should not be allowed. To sustain this writ and grant Sally the right to take the child back to Michigan means the Iowa courts will not have a chance to correct a mistake if that action turns out to be such. Appellants contend that to permit the immediate removal of Howard from the jurisdiction of the Iowa court will amount to an abandonment of its duty to protect the welfare of the child when its jurisdiction had been invoked by an action of habeas corpus. We do not concede that fact.

Being satisfied the child's interest and welfare will best be served by the transfer, we fail to see any failure of Iowa courts to properly perform their duty to protect the child's best interest. This was the extent of the trial court's judgment and we find no such abuse of its discretion in this matter as to call for a reversal. There is ample evidence to support its decision and we can only hope, as we always do in such custody disputes, that tomorrow its expectations will be fulfilled.

In passing, however, we will not concede the contention that this child's welfare and best interest will not be as well and carefully protected by the Michigan courts as by ourselves, and feel certain that if the child's best interest should again be questioned in a habeas corpus proceeding in Michigan, such interest would be fully and carefully protected.

VII. Counsel for plaintiff-appellee filed herein an application for attorney fees for special services rendered, and asked that such an award be taxed as a part of the costs herein. Under the circumstances we decline to do so, for the defense of

this action was based on honest and justifiable grounds, the child's best interest. No base or improper motives prompted the resistance and therefore each party should pay the well-earned fees of their respective counsels.

The judgment of the trial court in sustaining the writ of habeas corpus and in granting the mother, Sally, the permanent and sole custody of her son, Howard, must be affirmed.—Affirmed.

GARFIELD, C. J., and PETERSON, THORNTON, MOORE, and STUART, JJ., concur.

THOMPSON, HAYS, and SNELL, JJ., dissent.

THOMPSON, J. (dissenting):

I. The majority opinion removes this small child from the only home he has known, where he has been happy and well cared for for about two and one-half years, almost all of his short life, and sends him to the care of a mother who has suffered serious mental illness in the past and has admittedly been guilty of acts of sex deviation. It may be true that she has recovered from her mental troubles and that her sexual aberrations will not be repeated. But the child will be far removed from Iowa and it will be a practical impossibility for the father and the paternal grandparents in whose custody he has thrived to date to know what is happening to him or what the mother's mental condition and conduct may be, or for the Iowa courts to do anything about it if serious danger to his welfare develops. The mother voluntarily left him in his present home and for some time paid little or no attention to him.

As the majority rightly says it is impossible to know the future, and the courts can at best make only an educated guess as to what will best serve the interests of the child. In this situation there is an old rule which expresses the commonsense experience of men over the centuries. It is that when we cannot be certain we should leave well enough alone. We know the boy will be well cared for and reared where he is; we are gambling with his future when we send him to a new home and a new life in a distant state. I would follow the rule of common sense.

II. The majority states and follows another rule which it must be admitted has become fixed in our consideration of child-custody cases. It is that the trial court has discretion and we will reverse only when an abuse appears. Several cases, cited in the majority opinion, so hold. I think we should take another look at this rule. All child-custody cases, including habeas corpus when such custody is involved, are tried in equity, as the majority points out. This should mean that we try appeals de novo; such is the equity rule. But I suggest that if we are trying nothing but the question of the abuse of discretion of the trial court, we are not hearing these cases de novo on appeal. It is proper to give weight to the fact findings of the trial court; but if we confine our examination only to whether it has abused its discretion we are not examining the record to make our own determination on the facts as we should do. We should reexamine our pronouncements on this point, and modify them to the extent that the appellant has a real trial de novo. Our present rule, I apprehend, gives the appellant only a limited review, which amounts in effect to a determination whether there are facts which support the trial court's findings. The present rule makes our review little more than a review at law, in which the fact findings of the trial court have the force and effect of a special verdict. We should make our own examination and decision as to the weight of the evidence.

HAYS and SNELL, JJ., join in this dissent.