MARK WENDELL PAINTER, a minor, by HAROLD W. PAINTER, his father and next friend, appellee, v. DWIGHT BANNISTER et ux., appellants.

No. 51974.

(Reported in 140 N.W.2d 152)

FEBRUARY 8, 1966.

REHEARING DENIED JUNE 13, 1966.

Lundy, Butler, Wilson & Hall, of Eldora, for appellants.

Payer & Vanderbur, of Ames, for appellee.

STUART, J.—We are here setting the course for Mark Wendell Painter's future. Our decision on the custody of this seven-year-old boy will have a marked influence on his whole life. The fact that we are called upon many times a year to determine custody matters does not make the exercising of this awesome responsibility any less difficult. Legal training and experience are of little practical help in solving the complex problems of human relations. However, these problems do arise and under our system of government the burden of rendering a final de-

cision rests upon us. It is frustrating to know we can only resolve, not solve, these unfortunate situations.

The custody dispute before us in this habeas corpus action is between the father, Harold Painter, and the maternal grandparents, Dwight and Margaret Bannister. Mark's mother and younger sister were killed in an automobile accident on December 6, 1962, near Pullman, Washington. The father, after other arrangements for Mark's care had proved unsatisfactory, asked the Bannisters to take care of Mark. They went to California and brought Mark to their farm home near Ames in July 1963. Mr. Painter remarried in November 1964 and about that time indicated he wanted to take Mark back. The Bannisters refused to let him leave and this action was filed in June 1965. Since July 1965 he has continued to remain in the Bannister home under an order of this court staying execution of the judgment of the trial court awarding custody to the father until the matter could be determined on appeal. For reasons hereinafter stated, we conclude Mark's better interests will be served if he remains with the Bannisters.

Mark's parents came from highly contrasting backgrounds. His mother was born, reared and educated in rural Iowa. Her parents are college graduates. Her father is agricultural information editor for the Iowa State University Extension Service. The Bannister home is in the Gilbert community and is well kept, roomy and comfortable. The Bannisters are highly respected members of the community. Mr. Bannister has served on the school board and regularly teaches a Sunday school class at the Gilbert Congregational Church. Mark's mother graduated from Grinnell College. She then went to work for a newspaper in Anchorage, Alaska, where she met Harold Painter.

Mark's father was born in California. When he was two and one-half years old, his parents were divorced and he was placed in a foster home. Although he has kept in contact with his natural parents, he considers his foster parents, the McNellys, as his family. He flunked out of a high school and a trade school because of a lack of interest in academic subjects, rather than any lack of ability. He joined the navy at 17. He did not like it. After receiving an honorable discharge, he took

examinations and obtained his high school diploma. He lived with the McNellys and went to college for two and one-half years under the G. I. bill. He quit college to take a job on a small newspaper in Ephrata, Washington, in November 1955. In May 1956 he went to work for the newspaper in Anchorage which employed Jeanne Bannister.

Harold and Jeanne were married in April 1957. Although there is a conflict in the evidence on the point, we are convinced the marriage, overall, was a happy one, with many ups and downs as could be expected in the uniting of two such opposites.

We are not confronted with a situation where one of the contesting parties is not a fit or proper person. There is no criticism of either the Bannisters or their home. There is no suggestion in the record that Mr. Painter is morally unfit. It is obvious the Bannisters did not approve of their daughter's marriage to Harold Painter and do not want their grandchild reared under his guidance. The philosophies of life are entirely different. As stated by the psychiatrist who examined Mr. Painter at the request of Bannisters' attorneys: "It is evident that there exists a large difference in ways of life and value systems between the Bannisters and Mr. Painter, but in this case there is no evidence that psychiatric instability is involved. Rather, these divergent life patterns seem to represent alternative normal adaptations."

It is not our prerogative to determine custody upon our choice of one of two ways of life within normal and proper limits and we will not do so. However, the philosophies are important as they relate to Mark and his particular needs.

The Bannister home provides Mark with a stable, dependable, conventional, middle-class, middlewestern background and an opportunity for a college education and profession, if he desires it. It provides a solid foundation and secure atmosphere. In the Painter home Mark would have more freedom of conduct and thought with an opportunity to develop his individual talents. It would be more exciting and challenging in many respects, but romantic, impractical and unstable.

Little additional recitation of evidence is necessary to support our evaluation of the Bannister home. It might be pointed

out, however, that Jeanne's three sisters also received college educations and seem to be happily married to college graduates.

Our conclusion as to the type of home Mr. Painter would offer is based upon his Bohemian approach to finances and life in general. We feel there is much evidence which supports this conclusion. His main ambition is to be a free-lance writer and photographer. He has had some articles and picture stories published, but the income from these efforts has been negligible. At the time of the accident, Jeanne was willingly working to support the family so Harold could devote more time to his writing and photography. In the ten years since he left college he has changed jobs seven times. He was asked to leave two of them; two he quit because he did not like the work; two because he wanted to devote more time to writing and the rest for better pay. He was contemplating a move to Berkeley at the time of trial. His attitude toward his career is typified by his own comments concerning a job offer:

"About the Portland news job, I hope you understand when I say it took guts not to take it; I had to get behind myself and push. It was very, very tempting to accept a good salary and settle down to a steady, easy routine. As I approached Portland, with the intention of taking the job, I began to ask what, in the long run, would be the good of this job: 1, it was not *really* what I wanted; 2, Portland is just another big farm town, with none of the stimulation it takes to get my mind sparking. Anyway, I decided Mark and myself would be better off if I went ahead with what I've started and the hell with the rest, sink, swim or starve."

There is general agreement that Mr. Painter needs help with his finances. Both Jeanne and Marilyn, his present wife, handled most of them. Purchases and sales of books, boats, photographic equipment and houses indicate poor financial judgment and an easy come easy go attitude. He dissipated his wife's estate of about $4300, most of which was a gift from her parents and which she had hoped would be used for the children's education.

The psychiatrist classifies him as "a romantic and somewhat of a dreamer". An apt example is the plan he related for him-

self and Mark in February 1963: "My thought now is to settle Mark and myself in Sausilito, near San Francisco; this is a retreat for wealthy artists, writers, and such aspiring artists and writers as can fork up the rent money. My plan is to do expensive portraits ($150 and up), sell prints ($15 and up) to the tourists who flock in from all over the world * * *."

The house in which Mr. Painter and his present wife live, compared with the well kept Bannister home, exemplifies the contrasting ways of life. In his words "it is a very old and beat-up and lovely home * * *". They live in the rear part. The interior is inexpensively but tastefully decorated. The large yard on a hill in the business district of Walnut Creek, California, is of uncut weeds and wild oats. The house "is not painted on the outside because I do not want it painted. I am very fond of the wood on the outside of the house."

The present Mrs. Painter has her master's degree in cinema design and apparently likes and has had considerable contact with children. She is anxious to have Mark in her home. Everything indicates she would provide a leveling influence on Mr. Painter and could ably care for Mark.

Mr. Painter is either an agnostic or atheist and has no concern for formal religious training. He has read a lot of Zen Buddhism and "has been very much influenced by it". Mrs. Painter is Roman Catholic. They plan to send Mark to a Congregational Church near the Catholic Church, on an irregular schedule.

He is a political liberal and got into difficulty in a job at the University of Washington for his support of the activities of the American Civil Liberties Union in the university news bulletin.

There were "two funerals" for his wife. One in the basement of his home in which he alone was present. He conducted the service and wrote her a long letter. The second at a church in Pullman was for the gratification of her friends. He attended in a sport shirt and sweater.

These matters are not related as a criticism of Mr. Painter's conduct, way of life or sense of values. An individual is free to choose his own values, within bounds, which are not exceeded

here. They do serve however to support our conclusion as to the kind of life Mark would be exposed to in the Painter household. We believe it would be unstable, unconventional, arty, Bohemian and probably intellectually stimulating.

Were the question simply which household would be the most suitable in which to rear a child, we would have unhesitatingly chosen the Bannister home. We believe security and stability in the home are more important than intellectual stimulation in the proper development of a child. There are, however, several factors which have made us pause.

First, there is the presumption of parental preference, which, though weakened in the past several years, exists by statute. Code of Iowa, section 668.1, Code, 1962; Finken v. Porter, 246 Iowa 1345, 72 N.W.2d 445; Kouris v. Lunn, 257 Iowa 1267, 136 N.W.2d 502; Vanden Heuvel v. Vanden Heuvel, 254 Iowa 1391, 1399, 121 N.W.2d 216. We have a great deal of sympathy for a father who, in the difficult period of adjustment following his wife's death, turns to the maternal grandparents for their help and then finds them unwilling to return the child. There is no merit in the Bannister claim that Mr. Painter permanently relinquished custody. It was intended to be a temporary arrangement. A father should be encouraged to look for help with the children from those who love them without the risk of thereby losing the custody of the children permanently. This fact must receive consideration in cases of this kind. However, as always, the primary consideration is the best interest of the child and if the return of custody to the father is likely to have a seriously disrupting and disturbing effect upon the child's development, this fact must prevail. Vanden Heuvel v. Vanden Heuvel, supra; In re Guardianship of Plucar, 247 Iowa 394, 403, 72 N.W.2d 455; Carrere v. Prunty, 257 Iowa 525, 531, 133 N.W.2d 692, 696; Finken v. Porter and Kouris v. Lunn, both supra; rule 344(f)15, Rules of Civil Procedure.

Second, Jeanne's will named her husband guardian of her children and, if he failed to qualify or ceased to act, named her mother. The parent's wishes are entitled to consideration. Finken v. Porter, supra.

Third, the Bannisters are 60 years old. By the time Mark graduates from high school they will be over 70 years old. Care of young children is a strain on grandparents and Mrs. Bannister's letters indicate as much.

We have considered all of these factors and have concluded that Mark's best interest demands that his custody remain with the Bannisters. Mark was five when he came to their home. The evidence clearly shows he was not well adjusted at that time. He did not distinguish fact from fiction and was inclined to tell "tall tales" emphasizing the big "I". He was very aggressive toward smaller children, cruel to animals, not liked by his classmates and did not seem to know what was acceptable conduct. As stated by one witness: "Mark knew where his freedom was and he didn't know where his boundaries were." In two years he made a great deal of improvement. He now appears to be well disciplined, happy, relatively secure and popular with his classmates, although still subject to more than normal anxiety.

We place a great deal of reliance on the testimony of Dr. Glenn R. Hawks, a child psychologist. The trial court, in effect, disregarded Doctor Hawks' opinions, stating: "The court has given full consideration to the good doctor's testimony, but cannot accept it at full face value because of exaggerated statements and the witness' attitude on the stand." We, of course, do not have the advantage of viewing the witness' conduct on the stand, but we have carefully reviewed his testimony and find nothing in the written record to justify such a summary dismissal of the opinions of this eminent child psychologist.

Doctor Hawks is head of the Department of Child Development at Iowa State University. However, there is nothing in the record which suggests that his relationship with the Bannisters is such that his professional opinion would be influenced thereby. Child development is his specialty and he has written many articles and a textbook on the subject. He is recognized nationally, having served on the staff of the 1960 White House Conference on Children and Youth and as consultant on a Ford Foundation program concerning youth in India. He is now educational consultant on the project "Head Start". He has

taught and lectured at many universities and belongs to many professional associations. He works with the Iowa Children's Home Society in placement problems. Further detailing of his qualifications is unnecessary.

Between June 15 and the time of trial he spent approximately 25 hours acquiring information about Mark and the Bannisters, including appropriate testing of and "depth interviews" with Mark. Doctor Hawks' testimony covers 70 pages of the record and it is difficult to pinpoint any bit of testimony which precisely summarizes his opinion. He places great emphasis on the "father figure" and discounts the importance of the "biological father". "The father figure is a figure that the child sees as an authority figure, as a helper, he is a nutrient figure, and one who typifies maleness and stands as maleness as far as the child is concerned."

His investigation revealed: "* * * the strength of the father figure before Mark came to the Bannisters is very unclear. Mark is confused about the father figure prior to his contact with Mr. Bannister." Now, "Mark used Mr. Bannister as his father figure. This is very evident. It shows up in the depth interview, and it shows up in the description of Mark's life given by Mark. He has a very warm feeling for Mr. Bannister."

Doctor Hawks concluded that it was not for Mark's best interest to be removed from the Bannister home. He is criticized for reaching this conclusion without investigating the Painter home or finding out more about Mr. Painter's character. He answered:

"I was most concerned about the welfare of the child, not the welfare of Mr. Painter, not about the welfare of the Bannisters. Inasmuch as Mark has already made an adjustment and sees the Bannisters as his parental figures in his psychological makeup, to me this is the most critical factor. Disruption at this point, I think, would be detrimental to the child even tho Mr. Painter might well be a paragon of virtue. I think this would be a kind of thing which would not be in the best interest of the child. I think knowing something about where the child is at the present time is vital. I think something about where he might go, in my way of thinking is essentially untenable to

me, and relatively unimportant. It isn't even helpful. The thing I was most concerned about was Mark's view of his own reality in which he presently lives. If this is destroyed I think it will have rather bad effects on Mark. I think then if one were to make a determination whether it would be to the parents' household, or the McNelly household, or X-household, then I think the further study would be appropriate."

Doctor Hawks stated: "I am appalled at the tremendous task Mr. Painter would have if Mark were to return to him because he has got to build the relationship from scratch. There is essentially nothing on which to build at the present time. Mark is aware Mr. Painter is his father, but he is not very clear about what this means. In his own mind the father figure is Mr. Bannister. I think it would take a very strong person with everything in his favor in order to build a relationship as Mr. Painter would have to build at this point with Mark."

It was Doctor Hawks' opinion "the chances are very high [Mark] will go wrong if he is returned to his father." This is based on adoption studies which "establish that the majority of adoptions in children who are changed, from ages six to eight, will go bad, if they have had a prior history of instability, some history of prior movement. When I refer to instability I am referring to where there has been no attempt to establish a strong relationship." Although this is not an adoption, the analogy seems appropriate, for Mark who had a history of instability would be removed from the only home in which he has a clearly established "father figure" and placed with his natural father about whom his feelings are unclear.

We know more of Mr. Painter's way of life than Doctor Hawks. We have concluded that it does not offer as great a stability or security as the Bannister home. Throughout his testimony he emphasized Mark's need at this critical time is stability. He has it in the Bannister home.

Other items of Doctor Hawks' testimony which have a bearing on our decision follow. He did not consider the Bannisters' age anyway disqualifying. He was of the opinion that Mark could adjust to a change more easily later on, if one became

necessary, when he would have better control over his environment.

He believes the presence of other children in the home would have a detrimental effect upon Mark's adjustment whether this occurred in the Bannister home or the Painter home.

The trial court does not say which of Doctor Hawks' statements he felt were exaggerated. We were most surprised at the inconsequential position to which he relegated the "biological father". He concedes "child psychologists are less concerned about natural parents than probably other professional groups are." We are not inclined to so lightly value the role of the natural father, but find much reason for his evaluation of this particular case.

Mark has established a father-son relationship with Mr. Bannister, which he apparently had never had with his natural father. He is happy, well adjusted and progressing nicely in his development. We do not believe it is for Mark's best interest to take him out of this stable atmosphere in the face of warnings of dire consequences from an eminent child psychologist and send him to an uncertain future in his father's home. Regardless of our appreciation of the father's love for his child and his desire to have him with him, we do not believe we have the moral right to gamble with this child's future. He should be encouraged in every way possible to know his father. We are sure there are many ways in which Mr. Painter can enrich Mark's life.

For the reasons stated, we reverse the trial court and remand the case for judgment in accordance herewith.—Reversed and remanded.

All JUSTICES concur except THORNTON, J., who concurs in result.