STEPHAN G. and CATHY ROBIN ALINGH, by their next friend, ALBERT ALINGH, appellees, v. GERALD J. ALINGH et ux., appellants.

No. 52128.

July 14, 1966.

Herrick, Langdon, Sandblom & Belin, of Des Moines, and Murray & Murray, of Sheldon, all for appellants.

Herrick, Ary & Cook, of Cherokee, for appellees.

SNELL, J.—This is an action in habeas corpus involving the custody of two children. The trial court aptly referred to the children as "innocent pawns in this unfortunate and vexing litigation." Those contending for custody are the grandparents, who are the real plaintiffs, and the parents who are defendants.

An unfortunate situation existing through no one's fault was improving and gave evidence of an ultimate happy ending until defendants' ill-advised and contemptuous violation of a court decree precipitated this action.

Gerald J. Alingh and Hazel V. Alingh, referred to in the record as Vicky, were married in September 1954.

A son, Stephan, was born to defendants in October 1955. Vicky was physically and mentally ill. When Stephan was about four months old he suffered extensive and severe bodily injuries at the hands of his mother. For his safety and at the request of his father he was surrendered to and taken into the home of his paternal grandparents in Cherokee, Iowa. He has known no other permanent home.

A daughter, Cathy Robin Alingh, was born to defendants in September 1956.

The witnesses are not in agreement as to just what happened thereafter, but the record in a 1958 trial, received in evidence here by stipulation, shows that shortly after Cathy was born her mother "did again commit great acts of violence upon the person of Cathy Robin Alingh and that at the express consent and direc-

tion of the natural father, * * * Albert Alingh and LaVerne Alingh did receive and accept into their care the custody and person of Cathy Robin Alingh."

Cathy has known no other permanent home.

The parents list various complaints about the health, habits and development of the children but the record supports the trial court's finding: "The children are well adjusted in their grandparents' home in Cherokee, Iowa, which is adequate in all respects; they are well adjusted in school, in scouting (Cubs and Brownies) activities, and attend Sunday School at the Church of their parents' choice in Cherokee 'about 75 percent of the time.' The children are in good health." Review of the evidence on which this finding is based is unnecessary.

The grandparents have a limited income. They are in good health. The grandfather at the time of trial below was 63 years of age. He was employed. The grandmother was 57. While caring for the children she has had no outside employment.

The parents' situation was described by the children's father as follows:

"As to our marriage relationship, well, things were awful rocky in 1956; we had financial problems and family problems; and now, through the years we have gotten closer and closer. I would say our marriage is happier than most today. I have never left my wife; we have lived as man and wife through all of these difficulties and we are presently living together as man and wife. We have had an excellent marriage relationship."

Both parents are now gainfully employed in responsible positions. Although there have been some minor disputes with the grandparents over money the parents have not evaded their financial responsibilities. They have regularly furnished money for their children's support.

The children's mother, Vicky, was under the care of a psychiatrist in 1958 and 1961. She submitted to psychiatric evaluation August 30, September 3 and September 10, 1963, and to psychoanalysis in January 1965 and was still "in analysis" at the time of trial herein.

In 1958 the children's father brought an action in habeas corpus for the custody of the children. The parents wanted to place the children in a home in Des Moines (not their own) to

make visitation more convenient. We quote excerpts from the court's decree entered June 7, 1958.

"The mental condition of the mother is no different now than it was before.

"A psychiatrist, Ada R. Perel, M. D., of Des Moines, Iowa, now suggests as part of the treatment of the mother the children should be more readily available for visitations and that is the reason the parents now seek the custody of the children. However, the psychiatrist recommends that under no circumstances should the children be taken into the parents' home at this time.

"The children are residing in Cherokee, Iowa, and the parents are residing in Des Moines, Iowa, and at this time the psychiatrist recommends a two-hour visitation once a month. * * *

"This is a most unfortunate circumstance as far as the parents are concerned and the court has not overlooked their rights to the custody of their children and it is with reluctance that the court feels that it is now necessary to deny the return of the custody to the parents because of the danger to the children if the custody was returned. * * *

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the petition for a writ of habeas corpus be and the same is hereby denied and the custody of the children left in the home of the defendants.

"As to visitation, the father, Gerald J. Alingh, shall have the right to take the children out of the grandparents' home for a period not to exceed two hours in June 1958 and as frequently thereafter as recommended by the psychiatrist treating the mother, providing he shall notify the grandparents of the time that he will be making the visitation, he to be responsible for their safety. The parent will have the right to remove the children from the grandparents' home during the visitation."

While there is no evidence of continued psychiatric treatment at that time the results of this decision were apparently salutary. The parents have made progress professionally and in their family life. The mother has a responsible secretarial position and in her work apparently has emotional control. The children are doing well with the grandparents and enjoy a good and affectionate home life. The parents have availed themselves of visitation rights and have had the children in their home for

visits. There is no evidence of anything other than affectionate relationship between the parents and the children. Until impatience interfered there was progress toward reunion of the family.

The mother, Vicky, has consulted different psychiatrists but until January 1965 more for diagnosis than sustained treatment. In November 1963 her then examining psychiatrist referred her to Dr. Ada Dunner, a specialist in psychoanalytic therapy, but not until January 1965 did she seek an appointment. Both patient and the psychoanalyst at the first conference thought treatment necessary and that it would be beneficial. The psychoanalyst thought that whereas most analytic patients average from three to five years for treatment this patient would be a short-term patient. The doctor testified:

"I asked her right away to try to get her children because *I* wanted to see what she was going to do with them [emphasis added], after all, they were grown up, they were able to talk. The situation would not be the same. She was just aghast. She said 'You don't think I am fit to go get my children?' But I thought she was. I said, 'If you want to go into psychotherapy, if you want to solve problems, seek, go and get them.' She was so terrified she didn't try right away. * * *

"Q. You think, then, Doctor, it was good for this woman to beat her child when the child was an infant? A. This sounds very absurd, but academically, I think I said this already earlier. Perhaps this tragedy was ultimately fortunate in the long run, because it forced her to face herself. I would almost say it sounds ridiculous, I would almost say, yes. * * *

"A. What is best for Mrs. Alingh is also best for the children. It's actually identical. Like the fact that they were taken away from her at that time was best for her and was best for them. I mean, to me there is no difference. * * *

"Q. * * * Mrs. Alingh is your patient and I believe its to her that you owe the first duty of concern, isn't that correct? A. To her health I owe. * * *

"After the end of our first meeting I suggested that she get the children. Mrs. Alingh advised me that they were going to get the children. I knew they were going to get them but I don't

know how long ahead of time. It might have been less than a week. I know she was planning. * * *."

The doctor gave no credence to previous psychiatric reports and questioned the competence of other psychiatrists. She had no confidence in the value of certification in the specialty. We quote:

"Q. Let me say this. Doctor, you feel they are competent or do you look upon them as incompetent and untrained personnel that are dabbling in this field? A. There are many people who are certified to whom I would not refer a sick cat."

She also testified:

"I disagree with Dr. Sands' opinion and I disagree with the Supreme Court of Iowa's opinion and I am sure that the Supreme Court of Iowa is a fine body of lawyers but I am very doubtful as to their psychiatric qualifications, that's a difference of opinion between him and me but the Supreme Court of Iowa is as far as I am concerned a legal opinion and I will be delighted to refer to them for law but not for emotional adjustment."

She concluded her testimony on a note of irritation:

"I feel that the preceding question of the preceding counsel was irrelevant and I don't think this was an expert question and an expert witness was not to answer it and I feel that as a psychiatrist on the preceding as well as on this I'll take the Fifth Amendment, I think this is irrelevant, what actually my patient tells me is none of his business."

Throughout her testimony she maintained that the children should be returned to their parents and that it was not in the best interest of the children to be with the grandparents. She had never seen the children, the grandparents or anyone else who knew anything about the situation. Her opinion was based solely on her consultation with her patient toward whom she owed her primary duty.

We agree with the doctor that our psychiatric qualifications are doubtful but the ultimate responsibility in the case is ours and we must render our decision on the record as a whole and under the law. We are concerned, as is the doctor, about emotional adjustment but our greatest concern is the welfare of the children. We do not think the children should be used as a

therapeutic experiment. The psychiatrist may think that the severe and dangerous beating of infants was good for the mother but we cannot view such hazards with equanimity.

Even though we are not qualified in the field of psychiatry, as observed by the doctor, it seems to us significant that the mother's mental stresses and strains came to the surface and each time erupted coincident with her duties of motherhood. When relieved of the constant care incident to the care of small children her emotional stability improved.

Her psychoanalyst now suggests that she assume the care of the children as a test and as a part of her psychiatric treatment. The mother was "aghast" and "terrified" at the idea until prodded.

Since the 1958 court decree referred to, supra, the children have on different occasions been permitted to visit their parents for a few days at a time. On Saturday, May 29, 1965, the parents took the children for a visit in the parents' home in Norwalk. The children were to be returned the following Tuesday. The children were not returned. The father by phone said he was going to keep them and has never agreed to return the children to the grandparents.

The grandparents went to Indianola, conferred with the parents, the sheriff and county attorney and were served with an original notice of a suit by the parents in Warren County. This action in habeas corpus in Cherokee County followed.

That the acts of the parents, defendants herein, in attempting to regain custody as they did, were precipitous, ill-advised and in violation of the former decree of court is not denied. Such acts did not contribute to the sense of security essential to young children. The trial court deplored but did not base his decision thereon.

I. It is so well settled as to require no review of the authorities, and counsel agree, that the welfare of the children is the paramount and controlling consideration. See rule 344(f) 15, Rules of Civil Procedure.

All other considerations must yield to the best interests of the children. Their welfare is superior to the claim of anyone. Thein v. Squires, 250 Iowa 1149, 1157, 97 N.W.2d 156, and cases cited therein. 15 A. L. R.2d 432, 435.

■ The decree in child custody cases should not be for reward or punishment. Jensen v. Jensen, 237 Iowa 1323, 1325, 25 N.W.2d 316, 317; Dean v. Dean, 244 Iowa 1297, 1313, 60 N.W. 2d 551; Vanden Heuvel v. Vanden Heuvel, 254 Iowa 1391, 1399, 121 N.W.2d 216.

■ ■ II. "Where the right of custody has not been adjudicated it will be presumed, in the absence of evidence to the contrary, that a child's welfare will best be served by committing it to the custody of a parent. This presumption is resorted to merely to aid the court in determining what is for the best interests of the child." This presumption does not prevail where there has been a prior custody decree. In such cases the presumption is in favor of the prior decree. Thein v. Squires, supra, loc. cit. 1157, 1158.

■ III. These children have been in their grandparents' home since infancy. They are now nearly nine and ten years old. They are normal, happy and well adjusted children. As we said in Thein v. Squires, supra, loc. cit. 1159, "There is no reason to think the children will not be as well cared for * * * in the future as they have been in the past."

The length of time the children have been in plaintiffs' home is not controlling but it is a matter entitled to serious consideration. We have repeatedly expressed reluctance to interfere except for the most cogent reasons. Thein v. Squires, supra, loc. cit. 1158 and cases cited. For dissent from the application of the rule to the factual situation involved see dissenting opinion, loc. cit. 1163.

This from the dissenting opinion in Vanden Heuvel v. Vanden Heuvel, supra, loc. cit. 1405 of 254 Iowa, is appropriate: "* * * courts can at best make only an educated guess as to what will best serve the interests of the child. In this situation there is an old rule which expresses the commonsense experience of men over the centuries. It is that when we cannot be certain we should leave well enough alone. * * *."

In the case at bar we know what has happened in the past. We cannot foresee the future. Two able trial judges, one in 1958 and one in 1965, after seeing and hearing all the parties and supported by the record, found that there has been no such

change in conditions as .to justify a change in custody. With such a record before us we are reluctant to interfere in something that has been all right for ten years.

The situation here is not the same as in Vanden Heuvel, supra. There the mental illness was not so intimately connected with motherhood and the mother had recovered from her mental illness. Here there is improvement since relieved from care of children but the mother is still under the care of a psychiatrist.

■ IV. We have repeatedly held in cases cited, supra, that where as here there has been a previous custody decree the burden is upon one seeking a change to show a change in conditions.

The trial court found no such change since 1958 as to change custody.

· The trial court showing great consideration for all parties and hope for improved relations provided for regular visitation rights in the parents' home during school recess periods, but retained jurisdiction for review. This part of the decree has not been attacked.

The case is—Affirmed.

All JUSTICES concur.