Margaret Ann Garvin, a minor, by Darlene M. Leech, her aunt and next friend, appellee, v. Jack Garvin, appellant.

No. 52443.

(Reported in 152 N.W.2d 206)

JULY 11, 1967.

 █ 

Eckhardt, Goedken & Burns, of Muscatine, for appellant.

William H. Wellons, of Muscatine, for appellee.

RAWLINGS, J.—Habeas corpus proceedings by plaintiff-aunt to recover custody of a four-year-old niece who had resided with her periodically, the last time for more than two years, and been forcibly removed from the aunt's home by the child's father.

From trial court's decree adverse to defendant he appeals. We affirm.

Since each case of this nature must be determined according to the circumstances peculiar to it alone, the factual situation must be stated at some length.

When defendant-father was about two and a half his parents died. He was reared by an aunt, Mrs. Wilma Schafnit, and her husband on a farm near Atalissa. He graduated from high school, then worked for a time on the Schafnit farm.

Later he entered military service and September 9, 1953, married plaintiff's sister, Donna Schmelzer. Defendant adopted Darla Jean, Donna's daughter by a prior marriage.

At time of trial Darla Jean was about 15 and lived in Muscatine with her maternal grandmother, Mrs. Buntenbach.

Four children were born to Jack and Donna: Debbie, Johnnie, Terry and Margaret Ann.

After discharge from the service he and his wife lived for a short time in Muscatine.

Debts overwhelmed him. In 1961 he filed a petition and secured a discharge in bankruptcy. Financial obligations continued to accumulate and at time of trial a Muscatine collection agency held about $3100 in claims against him, one having been reduced to judgment upon which an execution was outstanding.

Unable to make ends meet at farming Jack began working for a roofing company.

Donna, the wife, took employment selling Bibles in Chicago and was absent from home much of the time.

In February 1963, Jack moved the family to Wheeling, Illinois, where he worked part time.

Later Donna moved with the children to Elkhart, Indiana. Jack remained in Chicago, visiting Donna and the children about once a month. Donna was also employed and Darla Jean, then about 12, cared for the other children. Another man lived with Donna during residence of the family in Elkhart. He was present during at least one of Jack's monthly visits.

April 15, 1963, because of Donna's illness, she and defendant brought Margaret Ann to the Leech home. Plaintiff testified on this occasion Donna told defendant, "If anything ever happens to me, I don't want you to remove this baby." The child then remained with plaintiff until September when Jack came to visit and returned her to the mother in Elkhart.

Pursuant to a telephone call from Donna, Mrs. Leech went to Elkhart in October of that year and again got the child. This time Margaret Ann stayed with the Leech family until December 14 when Jack came for her.

December 29, 1963, Mr. and Mrs. Leech went to Elkhart with some presents for the Garvin children. On returning they brought Margaret Ann back to their home. This time she remained with them for more than two years.

Plaintiff contends that sometime after December 30, 1963, Donna told her, in defendant's presence, she had cancer, and again said to him, "Jack, if anything ever happens to me, I don't want you to remove this baby; she's got a good home and she's loved."

Donna and Jack Garvin separated in September 1963. Since March 1964 he has not seen her. After Donna left, Jack placed the other children with various relatives. Because of the ages of the Schafnits he was afraid they would not be able to handle them all. Mr. and Mrs. Schafnit were then 66 and 64 years of age respectively.

In 1964 defendant filed an action for divorce from Donna. April 7, 1966, he was granted a decree. Jack knew this habeas corpus proceeding was then pending.

Defendant's earnings in 1964 totaled $7000, and in 1965 were $5500. During 1966 he lived part time on the Schafnit farm, commuting to and from Chicago trying to establish a used car business in Muscatine. He earned little or nothing that year.

However he and another man bought an airplane for $1900. Defendant claimed transportation to and from Chicago by air would be faster and less expensive than by car. More on this subject later.

Kenneth Leech, plaintiff's husband, is a tool or die maker and has been employed more than 18 years by the Aluminum Company of America.

In June 1956, this couple was divorced but remarried three months later. Since then they "have gotten along fine". These people own and live in a modern, well-kept, three bedroom home in Muscatine. At time of trial he was 40, she 39. They have two boys, one now about 19, the other 17.

Margaret Ann has become a part of the Leech family. She calls Mrs. Leech "Mommy" and has often done so in Jack's presence. In fact he has so addressed her, and has manifested complete satisfaction with the way the Leech family cared for the little girl. This, to Margaret Ann, is her home.

Defendant has contributed nothing toward the care and support of Margaret Ann during her stay in the Leech home. He says it was impossible for him to do so. He did send the child some presents.

During the winter seasons Margaret Ann suffers from bronchitis. Friday, February 11, 1966, Jack went to the Leech residence. He had professed a desire to have all the children

together for a Valentine's party the next day. Margaret Ann was ill and in periodic need of prescribed medication.

Mrs. Leech asked that he not take the child overnight because of her health and need for special bed accommodations in order to sleep. When defendant insisted on taking the child he was asked to wait until Mr. Leech arrived home. However Jack attempted to forcibly take Margaret Ann away from Mrs. Leech. In so doing he grabbed Darlene and what may best be described as a tussle ensued. The child was screaming, "don't hit Mommy any more".

Finally, getting the little girl away from Mrs. Leech, defendant ran out of the house. Margaret Ann was dressed only in playclothes. He was told by Mrs. Leech that she was going to call the police. This call was made.

Jack put the child in a car and drove to the Buntenbach home in Muscatine. At defendant's request Mr. Buntenbach tried but failed to contact Darla Jean at school.

Jack then took Margaret Ann to the Schafnit residence. February 14, 1966, Mr. Schafnit took Jack and the girl by car to Davenport. On his return to Atalissa Mr. Schafnit learned that a deputy sheriff was looking for Jack with a notice. He returned the same day to Davenport and so advised Jack, who promptly left for Chicago, taking the child with him. While there he tried and apparently did sell two used cars.

During their stay in Chicago Jack and the little girl lived in a rooming house. Sometimes he took her with him to work. On these occasions Margaret Ann remained in the car until she became tired. Other times he left her with baby-sitters. However March 31, 1966, after having been granted the divorce, he returned with the girl to Atalissa.

Defendant goes to church often and drinks only occasionally. Mr. and Mrs. Leech attend church regularly and take the little girl to Sunday school. She is being given dancing and swimming lessons.

In September 1966, Margaret Ann was scheduled to start attending the school located two blocks from the Leech home.

One witness, Mrs. Barbara Osborne, said: "I have observed Margaret Ann in the Leech home and feel that this is an ideal

home for this child. She is worshipped and loved. She is considered a member of the family." There is no contrary evidence.

Mable Bromley, another witness, testified substantially to the same effect. In fact this witness was in the Leech home when Jack came and forcibly took Margaret Ann away. She stated: "He knocked Darlene Leech against the walls, pulled her hair, was dragging her around and knocking her from side to side."

At time of trial defendant and the other three children were living in the Schafnit home, which is modern and contains six rooms.

According to Marie Fry, a schoolteacher, Jack Garvin is interested in the welfare of his children and has talked to the teachers about them on several occasions.

Alvin N. Roberts, a retired farmer living near Atalissa, said he knew defendant, had never seen him intoxicated, has not followed him closely the last five years, but thinks well of him.

Defendant's testimony discloses that at time of trial he planned to get a trailer house and put it in the yard of the Schafnit home. The trailer would be sitting on a slope so a basement could be put under it. He proposed to live in the basement with the boys, letting the girls live in the trailer itself. The Schafnit home would be connected by an intercom to the trailer. This way the Schafnits could keep a long-distance "listening watch" on the children.

Also in that connection defendant-father testified: "I do have an arrangement worked out with Mr. Schafnit for helping him on his farm. He is not going to pay me any money and the farming is not going to be done on shares. The arrangement is that there is work to be done and I am going to help him. He is helping me with the children and that is the only arrangement. What money I will need I will make in the car business. It is difficult to say how many cars I will sell per week until I get it set up, which I would have had by now without this delay. At this time, I do not rightly know what I have to do about setting it up. I have to talk to a guy in Davenport that I have tried to contact on two occasions but he has been on the road. I have people to sell the cars for me and this is my system. The arrangement that I have is that I can buy cars at wholesale

prices from various dealers that I have been associated with. There is no place in the United States that cars come in for any less money than Chicago. This I know from being in the business. In Chicago, there is a huge markup on cars. As an example: I bought a car for $275.00 and brought it back to Iowa with me. I spent $1.00 getting it washed and I had my brother sell it and he sold it for $525.00. He didn't even know how to sell a car. The man I am attempting to contact in Davenport, sells cars through his home. Some of the cars which come from Chicago will be driven here directly by myself. In regard to the airplane, I was going to use this to keep in touch with my cars financially which were located in the various cities. This might, for instance, necessitate myself flying to Chicago. Mainly, my flying would be in connection with arranging for a certain purchase which could possibly save me $150.00 to $200.00 on a car. I do not have a pilot's license, however. I was planning on getting one. I have never flown this plane by myself and I have never flown it for pleasure. I have never taken any lessons of the type that you would pay for. The extent of my lessons has been to fly with this group of individuals. I would put the gas in the plane, which was $3.00 an hour, and they would let me fly. In order to use that plane, I would have to abide by the laws and get a license. I figured this would cost between $1,-600.00 and $1,800.00 with the fuel included. I would also have to pass various flying tests and navigation tests."

Darla Jean, adopted daughter, testified she carried Margaret Ann out of the courthouse at defendant's direction after the habeas corpus hearing. She said the little girl was then yelling "I want my Mommy", meaning she wanted Darlene, the plaintiff in this case, because she talks about her all the time. As Darla Jean stated, the only home Margaret Ann has ever known is with Darlene and Kenneth Leech.

The trial court found the Leech home to be suitable and proper; Margaret Ann had lived there at various times prior to December 1963, and had resided with the Leech family more than two years prior to the hearing; to the child, plaintiff is her mother; Margaret Ann personally wants to stay in the Leech home where she is loved, contented and secure. The child was in

fact returned to plaintiff. As a result she has since been and is now living with Mr. and Mrs. Leech.

■ I. This being a habeas corpus action involving custody of a child it is reviewable de novo. Halstead v. Halstead, 259 Iowa 526, 144 N.W.2d 861, 864. We give due weight and consideration to the findings of the trial court but are not bound by them. Rule 344(f)(7), R. C. P.

■ II. In cases of this nature the first and governing consideration of the courts must be the best interest of the child. Rule 344(f)(15), R. C. P. This proposition is so well established that authorities need not be cited in support of it. See, however, Halstead v. Halstead, supra; Alingh v. Alingh, 259 Iowa 219, 144 N.W.2d 134, 138; and Painter v. Bannister, 258 Iowa 1390, 140 N.W.2d 152, 156.

In keeping pace with apparent advances by the behavioral sciences concerning benefits to children of a wholesome, loving and secure homelife, free from the trauma of needless transplantations, a majority of the courts hold there should be no automatic determination in favor of a parent.

And it has been said the "natural right" concept restricts thoughtful inquiry into latent problems of child development and should not be permitted to control, especially when the nonparent has occupied a loco parentis position for such a time as to become the true "parent by association".

In some instances an attempt has been made to resolve the problem of child custody by adoption of a biological approach premised upon the assumption a child's interests will per se be best served by residential association with others of the same bloodline. But in most cases this is nothing more nor less than the "natural right" theory in different garb. Stated otherwise the exclusive use of either of these relatively rigid approaches will usually produce the same net result.

■ The determination of all controversies of this nature requires a judicious approach, free from the taint of any thought of reward or punishment, the polestar being always the welfare of the child.

See authorities cited in Halstead v. Halstead, supra, and March 1967 issue, Family Law Quarterly, Volume I, No. 1, page

3, issued by American Bar Association, Family Law Section.

III. We have always been deeply concerned when confronted with the vitally important matter of child custody. And in recent years have consistently employed the best interest of the child concept in resolving all such conflicts. In cases of this nature courts should give due weight to the rights of a natural parent, balancing against that the child's best interests. This we have heretofore done. This we should continue to do.

In Painter v. Bannister, supra, five-year-old Mark was temporarily placed with maternal grandparents following death of his mother. During a two-year residence with the Bannisters the boy developed a strong identification with them and an acceptance of the grandfather as a "father figure". We held Mark's adjustment to life with the grandparents and danger of psychological impact of any reversion to an unstable life with the father dictated the boy be left with Mr. and Mrs. Bannister in the only home he had really ever known.

Alingh v. Alingh, supra, discloses injury to children during infancy by a mentally ill mother resulted in their placement with the paternal grandparents. This court determined, in an action by both parents to regain custody, the best interests of the children would be served by letting them continue to reside with the grandparents.

Then in Halstead v. Halstead, supra, we were confronted with an attempt by a mother to secure custody of a son who had lived with his paternal grandparents about ten years. Many respectable authorities giving strong support to the child oriented best interest concept are both quoted and cited. It is also there disclosed that the best interest of the child guideline is looked upon generally as being more realistic, modern and flexible than the so-called parental supremacy doctrine. Holding the child should remain in the only home he had ever really known this court there said, loc. cit., 259 Iowa 531, 144 N.W.2d 864: "* * * we have consistently taken the position it is highly desirable the status of a child be fixed as quickly as possible, be thereafter disturbed as little as possible, and then only for the most cogent reasons.

"Also, if the person having lawful care of a child at the time its custody is sought to be changed has properly provided and supervised its social, moral and educational needs for a substantial period of time, and the child has become attached to the environment and the people who have made possible the happiness, security and comfort of its early years, *a court is not justified in transferring that custody to another except for the most cogent reasons.* \* \* \*." (Emphasis supplied.)

Painter, Alingh and Halstead, supra, are not only in point but also here most persuasive.

Referring now to Lancey v. Shelley, 232 Iowa 178, 2 N.W.2d 781, this court, confronted with a factual situation similar to that presented here, denied the father and his second wife custody of a child where the evidence disclosed the petitioners were planning establishment of a home but had none to which the child could be taken at time of trial.

And in the leading case of Jensen v. Sorenson, 211 Iowa 354, 233 N.W. 717, a custody seeking father had arranged for an aunt and uncle to care for his son in event the court granted him the relief sought. In denying custody to the father we noted the speculative arrangement made in the nature of securing a home for the child was at best uncertain and subject to failure at anytime.

In that regard we said in Jensen v. Sorenson, supra, loc. cit., 211 Iowa 364: "It is important, as we have often said, that the custody of a child should be determined promptly, and that it should be permanent. The child must be given a place to *grow.* It should not be too readily transplanted. Nor should it be tossed like a ball from base to base. For three years this child has been growing in the Sorenson family, and has found affection there. In our judgment, no adequate reason is shown in the record for a change of custody, unless it should be held that the father has a primary right to such custody. In cases where others than the parent have maintained the care and custody of a child and have become bound to it in affection, we have not infrequently held the rights of such custodian to be paramount to the rights of a parent, in a given case."

IV. The precedent last cited has many times been approved by this court. It is also well established in this jurisdiction a child should not be compelled to exchange for known love, companionship and security in a suitable and proper home the uncertainties of a speculative, conjectural and sometimes frightening future. Halstead v. Halstead, 259 Iowa 526, 144 N.W.2d 861, 867.

As in the Halstead case the child here concerned has already been subjected to the emotional experience of being shunted too often from one home to another for no reason attributable to her or this plaintiff.

In that regard Margaret Ann's mother evidenced an awareness of the adverse effect of repeated transplantations of the child by her twice declared desire the child be left in the Leech home. While these requests may not be here controlling they are entitled to some consideration. See In re Guardianship of Carrick, 250 Iowa 1181, 1187, 98 N.W.2d 315; Finken v. Porter, 246 Iowa 1345, 1348, 72 N.W.2d 445; Joiner v. Knieriem, 243 Iowa 470, 482, 52 N.W.2d 21; Lancey v. Shelley, 232 Iowa 178, 186, 187, 2 N.W.2d 781; and Jensen v. Sorenson, 211 Iowa 354, 361, 362, 233 N.W. 717.

Furthermore defendant testified he told Mr. and Mrs. Leech in March 1964, at the time Donna left him, he was leaving Margaret Ann with them *until he could provide and care for her, and give her a proper home* with the rest of the children. This conversation, according to defendant, was repeated two or three times afterwards. But there is no evidence disclosing he has such a home as referred to in these conversations.

To now remove Margaret Ann from the Leech home to a presently nonexistent trailer house with an intercom "listening-in arrangement", would only serve to expose her to the hazards of another change, not understandable to a child of tender years, the impact of which may well be indelibly imprinted upon the mind and personality of this little girl for the rest of her life.

V. In the case now before us defendant-father: (1) Has no home; (2) no means with which to secure one; (3) his plans for establishment of a home are both conjectural and uncertain; (4) even in event of fulfillment, those plans are subject

·to change or termination at anytime; (5) he has admitted prior doubts as to the ability of his aunt and uncle, the Schafnits, to care for the Garvin children; and (6) the well-meant intentions expressed by defendant cannot at best be said to offer Margaret Ann a suitable and secure substitute home.

On the other hand Mr. and Mrs. Leech: (1) Have accorded and will continue to provide Margaret Ann a suitable and proper home with the only mother she has really ever known; (2) with no emotional trauma inflicted upon her by a premature transplantation; (3) she will be and remain in a wholesome atmosphere where love, understanding and security have become a stabilizing factor in the life pattern of the child; and (4) where the girl may grow and develop free from the uncertainties of the speculative life and home environment inherent in the suppositional hopes and plans of this defendant.

VI. This opinion is not an adjudication against the right of defendant to custody of Margaret Ann at such future time as showing is made he has a suitable and proper home for the child and it will be in her best interests to be placed in such home.

However we find no cogent reasons which compel or even justify her removal from the Leech home at this time.

It is to us apparent the trial court's decree is in accord with the greater weight of the evidence; is in keeping with the humanities of the case; and consistent with rule 344(f)(15), R. C. P., as repeatedly construed and applied by this court.

At the same time we are satisfied defendant is, in all fairness, entitled to reasonable visitation rights with the child and the trial court's decree should be accordingly modified.

We affirm, with modification as to visitation rights to be accorded defendant which shall be fixed and prescribed by the trial court.

Affirmed as modified and remanded for further order consistent with this opinion.

GARFIELD, C. J., and LARSON and SNELL, JJ., concur.

STUART, J., concurs in Divisions V and VI and the result.

MASON, MOORE and BECKER, JJ., dissent.

MASON, J.—I dissent. A more complete picture of the situation with which the defendant-father was faced requires narration of some additional facts.

During the last three or four months of defendant's Muscatine employment the wife became dissatisfied with the requirements of being a wife and mother and moved to Chicago to sell Bibles. She had previously engaged in other types of sales work. Defendant continued his employment during the daytime which made it necessary that he secure baby-sitters for the children. This problem influenced defendant to move the children to Wheeling, Illinois, a suburb of Chicago. Because of the difficulty of getting baby-sitters and the necessity of defendant taking care of the children while the wife continued her activities, he had only a part-time job. After a short stay in Wheeling the children were moved back to Muscatine; then to Elkhart, Indiana. On March 4, 1964, the mother left Elkhart without the children and went to California. Defendant has not seen nor heard from her since.

During the marriage defendant became indebted primarily, he asserts, as the result of Donna's dissatisfaction being a wife and mother. Prior to the Bible venture Donna's activities in the sales field required going into debt for different clothes, uniforms, transportation in the form of a car or otherwise. She would buy these things before starting the job which frequently did not work out and the bills remained. At time of trial the Muscatine credit bureau had accounts against defendant for $3100, some at least six years old, generally four or five years old. Defendant claimed most of these accounts had been discharged in bankruptcy in 1961. One account not so discharged was Ralph Neff's claim for rent prior to October 31, 1962, reduced to judgment January 2, 1963. Defendant contends this indebtedness was the result of Donna's renting a home they could not afford although they lived in it for approximately two years before moving to Wheeling. An airplane in which defendant had purchased a half interest was levied on under this judgment.

Defendant was faced with the situation created by the mother's complete indifference and lack of interest for the wel-

fare of her five children. She engaged in various sales projects that took her from the home and her family for days at a time, had at least one illicit relationship in the home where her children were residing and finally made a complete departure. Thus, defendant was forced to turn to those who loved his children when the burden of trying to be both father and mother became too heavy, and continue an arrangement that he believed under the circumstances was for the best interests of his family.

After Donna left, defendant brought Debbie and John back to the Schafnit farm, Darla to Gene and Nancy Garvin's in Muscatine. Gene is defendant's cousin and Nancy is also plaintiff's sister. Terry was taken to his maternal grandmother's, Margaret Buntenbach, also in Muscatine, where he stayed for some time but because of Mrs. Buntenbach's health was taken to Schafnits to be with Debbie and John. At the time of trial these three children were still staying with defendant's foster parents. Because of Mr. and Mrs. Schafnit's age, 66 and 64 respectively, all the children were not taken to the farm originally. After school was out in June 1965 Darla went to stay with Mrs. Buntenbach and was with her at time of trial.

Defendant testified that when he brought the other children from Elkhart he told the Leeches of being unable to contribute financially toward Margaret Ann's support, and if taking care of her would be beyond their financial means, he could have her cared for either by his sister in Cedar Rapids or his brother in Davenport. However, defendant preferred to have Margaret Ann in the Leech home since Darla would be just a few blocks away and could be in contact with her throughout the week. In addition it would have been impossible for defendant to go to Cedar Rapids or Davenport in order to get the children together when he came home weekends.

It is admitted that while plaintiff and her husband had Margaret Ann defendant made no contributions toward her support. Mr. Leech testified he neither asked for nor expected any help from defendant. Plaintiff and her husband were performing a charitable act and knew it.

"* * * A father should be encouraged to look for help with the children, from those who love them without the risk of

thereby losing the custody of the children permanently. This fact must receive consideration in cases of this kind." Painter v. Bannister, 258 Iowa 1390, 1396, 140 N.W.2d 152, 156.

Unless we give weight to this fact, parents may be deterred from temporarily placing children in other hands, even where the child's immediate best interests might be served by such a separation, e.g., as when natural parents are seriously injured and unable to properly care for the child. Such loss of confidence in the ability to regain custody might severely undermine the widespread resort to temporary foster homes. The resulting uncertainty would discourage not only unjustifiable separations but justifiable as well. 79 Harvard Law Review 1710, 1714 (1966), a case comment on Painter v. Bannister, supra.

The majority opinion gives weight to defendant's argument that "a parent in a time of need or crisis who loves his child, wants to provide the best training for it, but does not under any circumstances desire to give up the child permanently, is placed in an impossible situation. The soundest legal advice an attorney could give is that the parent place the child in a poor home. In this instance he would, therefore, have no difficulty in getting the child back. If the child is placed in a good home and the circumstances necessitate a long stay, whereby the child and foster home become attached, it may be next to impossible to remove this child."

After the four children were returned to the Muscatine-Atalissa area and began attending Wilton Junction school, defendant went to the school on numerous occasions, once to fill out school papers when Terry was injured, again to talk to Terry's teacher as he had had a small problem and to attend many evening meetings in order to brush up on his knowledge of modern math so he might better help his children. The elementary principal described defendant as showing "the concern that a father should for his children in their education."

During the trial and until entry of the court's decree, defendant and four of the children lived in the farm home of his foster parents, a modern six-room dwelling with bath and fully equipped with electricity. There are two bedrooms upstairs where the two boys and defendant slept in the large room and

the two girls in the other. The parents' bedroom is downstairs. Another room downstairs called the front room could be used as a bedroom. There is a vacant house on the Schafnits' other farm that Mr. Schafnit agreed could be used at anytime. Defendant had talked to his foster father about bringing Darla and Margaret Ann. His father indicated their house was a little small for that many (six additional).

The situation in the Schafnit home with five additional people is not ideal, neither is the prospect of the trailer nor the possibility of using the other farm home. However, the family seemed to get along under the same conditions during and following trial. Seldom, if ever, do we find an ideal situation for children from a broken home.

Living with her father, either in the Schafnit home or the trailer, Margaret Ann would have the benefit of being with her brothers and sisters. "* * * A brother and sister should not be separated and lose the benefit of constant association with one another except where the circumstances require it." McKay v. McKay, 253 Iowa 1047, 1053, 115 N.W.2d 151, 154, and citations. We find no circumstances here requiring her separation from the other children. This advantage where she may have to learn to share and develop a consideration for the rights of others in the family far outweighs the inconvenience of a crowded household.

The majority say Painter, Alingh and Halstead cited in that opinion are not only in point but also here most persuasive. In my opinion they are each factually distinguishable from the present case.

In Painter following the untimely death of his mother and sister, five-year-old Mark was temporarily entrusted to his maternal grandparents by his father in July 1963. Having remarried in November 1964, the father requested the return of Mark, but his request was denied by the grandparents. Mark was seven at time of trial, had been in Bannisters' home for two years and a change of custody would have meant changing the child from Iowa to California. We relied heavily on the testimony of a child psychologist and focused attention on the psychological ramifications of a custodial switch at this time in young Mark's

life. This testimony revealed Mark's strong identification with the Bannisters and his acceptance of Mr. Bannister as his "father figure." In deciding against a change, the court noted the probability, on the basis of analogous psychological studies and Mark's former history of instability, that he might "go bad" if removed from the security of the Bannister home.

Although there was justification for Harold Painter's placement of Mark with the Bannisters, and it was given consideration, it was held not to prevail against the likelihood of an adverse psychological impact on Mark, if he were returned to his father.

There is no showing here that a return of Margaret Ann to defendant is likely to have a seriously disrupting and disturbing effect upon her development.

In Alingh after each was injured at the hands of the mentally-ill mother, first Stephan, age four months, and then his infant sister Robin were surrendered to their paternal grandparents by their father. A 1958 habeas corpus proceeding, instituted by the father, was denied and this 1965 action by the grandparents was brought to compel the return of the children unlawfully taken by the father. We affirmed a decision for the grandparents. At the time of trial the children, nine and ten, had been in the grandparents' home since infancy and a change in custody would have meant returning the children to a home where they had previously been physically abused by a mentally-ill mother. The court refused to change custody in view of the uncertainty of the wife's reaction to the responsibility of motherhood.

In Halstead at age two, Phillip was brought to his paternal grandparents' home by his mother. Three years later, following her divorce from Phillip's father, her second husband, she married a third time and moved to Texas, leaving Phillip with his grandparents, with whom he has remained. We reversed the lower court which had granted the mother custody after the natural father's death in 1965. At the time of trial Phillip was 12 years old, had been in his grandparents' home ten years, was visited by his mother about six times prior to trial and a change would have resulted in the child being taken from Oran to Texas.

In all three cases a change would have resulted to a new and strange environment.

Here the trial court found defendant had visited Margaret Ann on an average of once every two weeks while she was in plaintiff's home. On these occasions she would be taken to the Schafnit farm to be with her brothers and sisters. She had lived with defendant from February 11 to May 11, 1966. They were not strangers. The Schafnit farm, approximately 12 miles from the Leech home, would not constitute a change to a new and strange environment.

No stepmother nor stepbrothers or sisters are involved here.

Defendant's frequent trips to Muscatine to be with his children, his efforts to be more help to them in their schoolwork and his consideration for Darla's schooling is much stronger evidence of parental interest than any shown in Painter, Alingh or Halstead.

No complaint was made of the circumstances under which Margaret Ann was living while in the Schafnit home during the trial nor is there complaint about the conditions under which the other children of this father are living.

Is the home now being furnished satisfactory as being for the best interest of three of his children but not for the best interest of Margaret Ann? The majority does not attempt to answer this question.

In child custody cases the primary concern is the best interests and welfare of the child, but we are not of the same mind as to what that is in this instance. This is not easily determined with always a chance of human failure. We must weigh the benefits to the child and give them consideration along with the detriments.

The majority opinion says, "In June 1956, this couple [plaintiff and Kenneth] was divorced but remarried three months later. Since then they 'have gotten along fine'." This is not the record. Plaintiff commenced three divorce actions against Kenneth, one before the divorce action of 1956 and one following. She testified, "The last time I sued my husband for divorce was before we bought this home. Since I filed my last

divorce, my husband and I have gotten along fine. We have had no trouble."

Plaintiff, admittedly hotheaded, testified as to her haste in securing a writ of habeas corpus: "I didn't think after the way he beat me up he would have guts enough to come back into my home and bring her back."

Plaintiff, the mother of two sons, 19 and 17, living at home, has made Margaret Ann the center of attention while in her home. The trial court found Margaret Ann had been "doted upon by her aunt." She has been taken by plaintiff's older son on his dates, to high school athletic affairs by the family to be made a fuss over and generally waited on hand and foot. I feel under these circumstances discipline might become a problem and the sons, 19 and 17, might soon find a spoiled child a "pest."

Weighing all the factors I am convinced the interest of Margaret Ann will be best served by placing her with her father.

Although the child is loved, well cared for and considered an important part of the plaintiff's family three divorce actions, at least commenced, in one of which plaintiff asked that one of her sons be awarded to Kenneth and the other to her, do not reveal this to be a home where Margaret Ann may grow and develop free from the uncertainties of a speculative life and home environment which the majority feel is inherent in the defendant's situation.

Even the Family Law Section's 1963 model act, referred to in Halstead v. Halstead, supra, 259 Iowa, at 533, 144 N.W.2d, at 865, speaks only to a prima facie right of the de facto custodian, not an automatic one. The concern of the Family Law Section was with absolute rules (like the "natural right" theory) which lacked the sufficient flexibility to account for varying circumstances. Obviously, a contrary rule that the de facto custodian must be awarded custody, would be equally rigid and undesirable. The foregoing statement is from the Family Law Quarterly cited by the majority in Division II.

The majority say they "hold there should be no automatic determination in favor of a parent." However, the other extreme suggested in the statement from the Family Law Quarterly, supra, is just as undesirable. In my opinion the majority is

coming dangerously close. Where is there room left for the necessary flexibility? I would reverse.

MOORE and BECKER, JJ., join in this dissent.