**In the Interest of George Michael McGLAS-SON, a child, Petition to Terminate Parental Relationship, David Larner, Intervenor-Appellant.**

**No. 54911.**

Supreme Court of Iowa.

Feb. 25, 1972.

Life, Davis & Life, Oskaloosa, for intervenor-appellant.

Richard C. Turner, Atty. Gen., Lorna Lawhead Williams, Sp. Asst. Atty. Gen., Robert B. Dickey, County Atty., and Barry M. Anderson, Deputy County Atty., Keokuk, for appellee.

REYNOLDSON, Justice.

The Lee County Attorney initiated this action under § 232.41, The Code, to terminate the parent-child relationship between George Michael McGlasson and his mother, Mary (McGlasson) Mortimer. The child's sister, Delphia Mea Larner, and her husband, David Larner, intervened, petitioned for custody, and participated in the hearing. Juvenile court terminated the relationship and granted permanent care, custody and control to Lee County Department of Social Services for the purpose of placing the child for adoption. From denial of the petition for custody, intervenor David Larner appeals. We affirm.

The child, George, born September 26, 1965, was one of 13 issue of the mother's marriage to Scott McGlasson, who died in December 1968. Custody of six of the children had been assumed by welfare authorities in Missouri. The mother remarried to a Mr. Mortimer, the father of 11 children by a prior marriage. At time of trial the couple resided with two of the mother's younger children in Alexandria, Missouri, in a two-room mobile home with one-room addition.

Before his father's death, George and a sister, Sandra, were placed by the mother and their father with the intervenors. Although a written agreement was executed by the adults, the juvenile court rightly found it had no efficacy as any type of adoption proceeding.

This arrangement, disrupted by continual bickering regarding discipline philosophy and visitation rights, lasted only 11 months. George and Sandra were returned to the mother and her second husband. In May of 1969, George was turned over to Lee County Department of Social Services by the mother who said she wanted him placed in a home. Following appropriate court procedures, George was held to be neglected and dependent by order dated December 19, 1969. Custody was placed in Lee County Department of Social Services subject to court's continuing jurisdiction.

Since that time, the department has placed George in two foster homes. At time of trial he was in the care of a couple who wanted to adopt him. His progress was detailed in the testimony of department's qualified child case worker:

"When George Michael was first placed, his physical appearance was small * * * emotionally, he laid down on the floor and kicked himself and cried, bad boy, bad boy. * * *

"Since that time he has been under the foster care of the * * * department * * *. There has been a general overall improvement. He talks and laughs and runs and plays. He is emotionally settled down. He's secure. * * * Physical appearance, when we first had him, he was so nervous, he kept all fingers in his mouth * * * finally, after a period of time, his emotions held down and [he] took the fingers out of his mouth, and now he has some front teeth * * *. He is quite a happy-go-lucky boy."

After George was taken back to his mother, intervenor Mr. Larner undertook a tenacious and almost morbid campaign to obtain his return. He put the mother in fear of her own safety. Following an attempted physical assault upon her he pled guilty to the resulting criminal charge. A second charge grew out of a bizarre attempt to obtain George after his placement in a Lee County foster care home. By his admission Larner has spent thousands of dollars and lost employment seeking the boy's release from department custody. His wife testified that getting custody of George "quite frankly, has been his primary concern in the last two years."

The Larner home is in Missouri near the town of Alexandria, as it has been at all pertinent times. It is adequate, and Larner's projected income sufficient, to support George. There are no other children in intervenors' family. Their testimony indicated an avowed interest in George's future education and religious training. There is no compelling reason to regard intervenors as persons per se unfit to have custody. It is the surrounding living situation coupled with the perplexing question of Larner's judgmental behavior which make an award to intervenors potentially undesirable.

I. The facts distinguish this case from the usual custody conflicts which involve two parents or a parent and a third party. At hearing the mother made no serious effort to regain custody and she does not appeal. It is also significant that Mrs. Larner does not join her husband in this appeal. In any event, the issue now is narrowed to intervenors' petition to be awarded George's custody under § 232.48, The Code, as "a reputable individual of good moral character." The juvenile court instead awarded custody to another statutory choice, "The county department of social welfare or the commissioner of social services or his designee." Even though our decisions reveal no similar factual backdrop, the well established rules governing custody awards in Iowa apply.

Our review is de novo. The Code, § 232.58; Harter v. State, 260 Iowa 605, 149

N.W.2d 827 (1967); In re Morrison, 259 Iowa 301, 144 N.W.2d 97 (1966). Especially when considering the credibility of witnesses we give weight to the fact findings of the trial court but are not bound by them. Rule 344(f) (7), Rules of Civil Procedure. This proposition is particularly applicable in a matter of this kind. In re Yardley, 260 Iowa 259, 149 N.W.2d 162 (1967).

 The first and governing consideration here, as in all such cases, is the child's best interest. Rule 344(f) (15), R.C.P. This is also true in controversies where neither of the contending parties is a parent of the child. 42 Am.Jur.2d, Infants § 43, pp. 44–45. Also pertinent is the general custody rule stated in 43 C.J.S., Infants § 7, p. 57:

"In determining who should have custody of the infant, a relative of the child will usually be preferred as against a stranger but not always, as where it is not for the best interest and welfare of the child."

Determination in child custody cases is necessarily based on what is likely to occur in the future because of present conditions and because of what has occurred in the past. In re in the Interest of Warren, 178 N.W.2d 293 (Iowa 1970); In re Morrison, 259 Iowa 301, 144 N.W.2d 97 (1966). In considering the best interest of the child in dispute, the court will consider the long-range interests as well as the immediate interests of the child. Raabe v. Raabe, 191 N.W.2d 551 (Iowa 1971); Dunaway v. Dunaway, 189 N.W.2d 480 (Iowa 1971).

George's future must be approached with these often articulated rules in mind. We conclude his best interest lies in his remaining outside the locus of the bickering and rivalry existing between his mother and his brother-in-law, who live only four miles apart. His marked physical and emotional improvement following his removal from that environment is evi-

dent. George is now legally available for adoption. He should pursue this new course without the trauma of shuttling between his familial homes.

Though the facts are dissimilar, our statement in Garvin v. Garvin, 260 Iowa 1082, at 1092, 152 N.W.2d 206, at 212 (1967) is relevant. There we said a child involved in a custody case, "should not be compelled to exchange for known love, companionship and security in a suitable and proper home the uncertainties of a speculative, conjectural and sometimes frightening future." Here the evidence supports a finding that George has a better opportunity to find stability and happiness in his present circumstances than in his own volatile family.

Accordingly, the juvenile court decision is

Affirmed.

All Justices concur.